Consolidated Case Nos. 23-3159, 23-3175, 23-3340, 23-3363, 23-3385

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

BRIAN ELKINS and ANNIE ELKINS,
*Plaintiffs-Appellees*,

v.

SOUTHEASTERN INDIANA HEALTH MANAGEMENT, INC., d/b/a
COLUMBUS REGIONAL HEALTH,
*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division
Case No. 1:23-cv-01117, the Honorable James R. Sweeney, II

## OPENING BRIEF OF DEFENDANTS-APPELLANTS

MATTHEW T. ALBAUGH
PETER S. FRENCH
VIVEK R. HADLEY
**TAFT STETTINIUS
& HOLLISTER LLP**
One Indiana Square,
Suite 3500
Indianapolis, IN 46204
317.713.3500
malbaugh@taftlaw.com
pfrench@taftlaw.com
vhadley@taftlaw.com

PAUL G. KARLSGODT
**BAKER &
HOSTETLER LLP**
1801 California Street,
Suite 4400
Denver, CO 80202
303.861.0600
pkarlsgodt@bakerlaw.com

DAVID A. CARNEY
**BAKER &
HOSTETLER LLP**
127 Public Square,
Suite 2000
Cleveland, OH 44114
216.621.02000
dcarney@bakerlaw.com

*Attorneys for Consolidated Defendants-Appellants*

**Circuit Rule 26.1 Disclosure Statement**

Appellate Court No: <u>23-3159</u>

Short Caption: <u>Brian Elkins, et al v. Southeastern Indiana Health Management,Inc.</u>

**[ X ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1 of the United States Court of Appeals for the Seventh Circuit, Defendant Indiana Port Commission discloses the following information:

(1) The full name of every party that the attorney represents in the case:

<u>Southeastern Indiana Health Management Inc. d/b/a Columbus Regional Health</u>

(2) The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court.

<u>Taft Stettinius & Hollister LLP</u>

(3) **If the party is a corporation (NEW):**

**<u>Southeastern Indiana Health Management, Inc., has no parent, and no publicly-traded company owns 10% of its stock.</u>**

(4) Organizational Victims in Criminal Cases: <u>N/A</u>

(5) Debtor information required by FRAP 26.1(c) 1 & 2: <u>N/A</u>

Attorney's signature: <u>*/s/Matthew T. Albaugh*</u>    Date: <u>February 26, 2024</u>

Attorney's printed name: <u>Matthew T. Albaugh</u>

Please indicate if you are Counsel of Record for the above listed party pursuant to Circuit Rule 3(d):   [ X ] Yes      [  ] No

Address:    <u>One Indiana Square, Ste. 3500, Indianapolis, IN 46204</u>

Phone number: <u>(317) 713-3500</u>          Fax number: <u>(317) 713-3699</u>

Email address: <u>malbaugh@taftlaw.com</u>

i

**Circuit Rule 26.1 Disclosure Statement**

Appellate Court No: <u>23-3159</u>

Short Caption: <u>Brian Elkins, et al v. Southeastern Indiana Health Management,Inc.</u>

**[ X ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1 of the United States Court of Appeals for the Seventh Circuit, Defendant Indiana Port Commission discloses the following information:

(1) The full name of every party that the attorney represents in the case:

<u>Southeastern Indiana Health Management Inc. d/b/a Columbus Regional Health</u>

(2) The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court.

<u>Taft Stettinius & Hollister LLP</u>

(3) **If the party is a corporation (revised):**

**<u>Southeastern Indiana Health Management, Inc., has no parent, and no publicly-traded company owns 10% of its stock.</u>**

(4) Organizational Victims in Criminal Cases: <u>N/A</u>

(5) Debtor information required by FRAP 26.1(c) 1 & 2: <u>N/A</u>

Attorney's signature: <u>*/s/Peter S. French*</u>    Date: <u>February 26, 2024</u>

Attorney's printed name: <u>Peter S. French</u>

Please indicate if you are Counsel of Record for the above listed party pursuant to Circuit Rule 3(d):   [ X ] Yes      [  ] No

Address:    <u>One Indiana Square, Ste. 3500, Indianapolis, IN 46204</u>

Phone number: <u>(317) 713-3500</u>        Fax number: <u>(317) 713-3699</u>

Email address: <u>pfrench@taftlaw.com</u>

ii

## Circuit Rule 26.1 Disclosure Statement

Appellate Court No: <u>23-3159</u>

Short Caption: <u>Brian Elkins, et al v. Southeastern Indiana Health Management,Inc.</u>

**[ X ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1 of the United States Court of Appeals for the Seventh Circuit, Defendant Indiana Port Commission discloses the following information:

(1) The full name of every party that the attorney represents in the case:

<u>Southeastern Indiana Health Management Inc. d/b/a Columbus Regional Health</u>

(2) The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court.

<u>Taft Stettinius & Hollister LLP</u>

(3) **If the party is a corporation (revised):**

**<u>Southeastern Indiana Health Management, Inc., has no parent, and no publicly-traded company owns 10% of its stock.</u>**

(4) Organizational Victims in Criminal Cases: <u>N/A</u>

(5) Debtor information required by FRAP 26.1(c) 1 & 2: <u>N/A</u>

Attorney's signature: <u>*/s/Vivek R. Hadley*</u>     Date: <u>February 26, 2024</u>

Attorney's printed name: <u>Vivek R. Hadley</u>

Please indicate if you are Counsel of Record for the above listed party pursuant to Circuit Rule 3(d):   [ X ] Yes       [   ] No

Address:     <u>One Indiana Square, Ste. 3500, Indianapolis, IN 46204</u>

Phone number: <u>(317) 713-3500</u>          Fax number: <u>(317) 713-3699</u>

Email address: <u>vhadley@taftlaw.com</u>

**Circuit Rule 26.1 Disclosure Statement**

Appellate Court No: <u>23-3175</u>

Short Caption: <u>Lamarr v. Goshen Health System, Inc.</u>

**[  ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1 of the United States Court of Appeals for the Seventh Circuit, Defendant Indiana Port Commission discloses the following information:

(1) The full name of every party that the attorney represents in the case:
<u>Goshen Health System Inc.</u>

(2) The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court.
<u>Baker & Hostetler LLP</u>
<u>Bose McKinney & Evans LLP</u>

(3)  If the party is a corporation:
    i)  Identify all of its parent corporations, if any; and
      <u>none</u>
    ii) list any publicly held company that owns 10% or more of the party's stock:
      <u>none</u>

(4) Organizational Victims in Criminal Cases: <u>NA</u>

(5) Debtor information required by FRAP 26.1(c) 1 & 2 – <u>NA</u>

Attorney's signature: <u>*/s/Paul G. Karlsgodt*</u>    Date: <u>February 26, 2024</u>

Attorney's printed name: <u>Paul G. Karlsgodt</u>

Please indicated if you are Counsel of Record for the above listed party pursuant to Circuit Rule 3(d):    [ X ] Yes      [  ] No

Address:    <u>Baker & Hostetler LLP</u>
               <u>1801 California Street, Suite 4400</u>
               <u>Denver, CO 80202</u>
Phone number: <u>(303) 861-0600</u>    Fax number: <u>(303) 861-7805</u>
Email address: <u>pkarlsgodt@bakerlaw.com</u>

iv

## Circuit Rule 26.1 Disclosure Statement

Appellate Court No: <u>23-3340</u>

Short Caption: <u>John Doe v. Sarah Bush Lincoln Health Center</u>

**[  ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1 of the United States Court of Appeals for the Seventh Circuit, Defendant Indiana Port Commission discloses the following information:

(1) The full name of every party that the attorney represents in the case:
<u>Sarah Bush Lincoln Health Center</u>

(2) The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court.
<u>Baker & Hostetler LLP</u>

(3)  If the party is a corporation:
   i)  Identify all of its parent corporations, if any; and
       <u>Sarah Bush Lincoln Health</u>
   ii) list any publicly held company that owns 10% or more of the party's stock:
       <u>NA</u>

(4) Organizational Victims in Criminal Cases: <u>NA</u>

(5) Debtor information required by FRAP 26.1(c) 1 & 2 – <u>NA</u>

Attorney's signature: <u>*/s/ David Carney*</u>          Date: <u>February 26, 2024</u>

Attorney's printed name: <u>David Carney</u>

Please indicated if you are Counsel of Record for the above listed party pursuant to Circuit Rule 3(d):    [ X ] Yes      [  ] No

Address:     <u>127 Public Square, Suite 2000, Cleveland, OH 44114</u>

Phone number: <u>(216) 861-7634</u>      Fax number: <u>(216) 621-0200</u>

Email address: <u>dcarney@bakerlaw.com</u>

**Circuit Rule 26.1 Disclosure Statement**

Appellate Court No: <u>23-3363</u>

Short Caption: <u>Fleece v. Hancock Regional Hospital</u>

**[  ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1 of the United States Court of Appeals for the Seventh Circuit, Defendant Indiana Port Commission discloses the following information:

(1) The full name of every party that the attorney represents in the case:
<u>Board of Trustees of the Hancock Regional Hospital</u>

(2) The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court.
<u>Baker & Hostetler LLP</u>
<u>Bose McKinney & Evans LLP</u>

(3)  If the party is a corporation:
   i)  Identify all of its parent corporations, if any; and
     <u>none</u>
   ii) list any publicly held company that owns 10% or more of the party's stock:
     <u>none</u>

(4) Organizational Victims in Criminal Cases: <u>NA</u>

(5) Debtor information required by FRAP 26.1(c) 1 & 2 – <u>NA</u>

Attorney's signature: <u>*/s/Paul G. Karlsgodt*</u>     Date: <u>February 26, 2024</u>

Attorney's printed name: <u>Paul G. Karlsgodt</u>

Please indicated if you are Counsel of Record for the above listed party pursuant to Circuit Rule 3(d):    [ X ] Yes     [  ] No

Address:   <u>Baker & Hostetler LLP, 1801 California Street, Suite 4400</u>
            <u>Denver, CO 80202</u>
Phone number: <u>(303) 861-0600</u>    Fax number: <u>(303) 861-7805</u>
Email address: <u>pkarlsgodt@bakerlaw.com</u>

**Circuit Rule 26.1 Disclosure Statement**

Appellate Court No: <u>23-3385</u>

Short Caption: <u>Chiaro et al. v. Methodist Hospitals</u>

**[  ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1 of the United States Court of Appeals for the Seventh Circuit, Defendant Indiana Port Commission discloses the following information:

(1) The full name of every party that the attorney represents in the case:
<u>The Methodist Hospitals, Inc.</u>

(2) The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court.
<u>Baker & Hostetler LLP</u>
<u>Bose McKinney & Evans LLP</u>

(3)  If the party is a corporation:
    i)  Identify all of its parent corporations, if any; and
      <u>none</u>
    ii) list any publicly held company that owns 10% or more of the party's stock:
      <u>none</u>

(4) Organizational Victims in Criminal Cases: <u>NA</u>

(5) Debtor information required by FRAP 26.1(c) 1 & 2 – <u>NA</u>

Attorney's signature: <u>*/s/Paul G. Karlsgodt*</u>    Date: <u>February 26, 2024</u>

Attorney's printed name: <u>Paul G. Karlsgodt</u>

Please indicated if you are Counsel of Record for the above listed party pursuant to Circuit Rule 3(d):    [ X ] Yes     [  ] No

Address:    <u>Baker & Hostetler LLP, 1801 California Street, Suite 4400</u>
            <u>Denver, CO 80202</u>
Phone number: <u>(303) 861-0600</u>    Fax number: <u>(303) 861-7805</u>
Email address: <u>pkarlsgodt@bakerlaw.com</u>

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ..................................................... i

TABLE OF CONTENTS .................................................... viii

TABLE OF AUTHORITIES ..................................................... x

JURISDICTIONAL STATEMENTS ......................................... 1

STATEMENT OF ISSUES.................................................... 4

STATEMENT OF THE CASE ............................................... 6

    A.   The Website Visitors' Petitions Allege Privacy
        Violations on the Healthcare Provider's Publicly
        Available Websites. ................................................. 6

    B.   The Website Providers' Actions in Making Health
        Information Technology Accessible from Websites Was
        in Direct Furtherance of Federal Policy. ............................. 8

        1.   President George W. Bush Establishes the
               Position of National Health Information
               Technology Coordinator. ............................................. 8

        2.   Congress Uses Financial Incentives and Penalties
               to Ensure That Healthcare Providers Make
               Health Records and Information Available
               Online. ............................................................. 8

        3.   The National Coordinator Makes Online Access
               to Health Information a Key Component of the
               Meaningful Use Regulations. ..................................... 11

        4.   The Federal Government Compels Healthcare
               Providers' Compliance Through "Meaningful Use"
               Directives....................................................... 13

    C.   The Healthcare Providers Remove and the District
        Courts Order Remand.......................................... 18

SUMMARY OF ARGUMENT ................................................................. 20

ARGUMENT ........................................................................................ 22

    A.    Standard of Review. ........................................................ 22

    B.    The Purpose of the Federal Officer Removal Statute is to Protect Federal Interests. ............................................. 22

    C.    The Healthcare Providers Are "Acting Under" the Direction of a Federal Officer. ......................................... 24

        1.    The Federal Government's Incentive Payments Highlight the Healthcare Providers' "Acting Under" Relationship .................................................. 26

        2.    The Healthcare Providers Assist the Federal Government with Improving Patient Access to and Engagement with Health Care Information Technology and Records ............................................ 31

    D.    The Court Should Not Follow the Eighth Circuit's Decision in *BJC Healthcare*. .............................................. 35

    E.    Plaintiffs' Claims Relate to Actions That The Healthcare Providers Took Under Federal Direction. ........ 41

    F.    The Healthcare Providers Raise Colorable Federal Defenses .......................................................................... 46

        1.    Defenses Under HIPAA ............................................ 46

        2.    Preemption Defenses .................................................. 48

CONCLUSION ................................................................................... 49

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ..................................................................................... 52

CERTIFICATE OF SERVICE ............................................................ 53

CIRCUIT RULE 30 APPENDIX ........................................................ 54

# TABLE OF AUTHORITIES

**Page**

## Cases

*Arizona v. Manypenny*,
   451 U.S. 232 (1981) ............................................................................ 28

*Baker v. Atlantic Richfield Co.*,
   962 F.3d 937 (7th Cir. 2020) ...................................................... *passim*

*Betzner v. Boeing Co.*,
   910 F.3d 1010 (7th Cir. 2018) ............................................................ 22

*Brian Elkins and Annie Elkins v. Southeastern Indiana
   Health Management Inc. d/b/a Columbus Regional
   Health*,
   Case No. 1:23-cv-01117-JRS-TAB (S.D. Ind. June 26,
   2023) ...................................................................................................... 1

*Brian Elkins and Annie Elkins v. Southeastern Indiana
   Health Management Inc. d/b/a Columbus Regional
   Health*,
   Case No. 49D01-2305-PL-020792 (Mar. Cty. Sup. Ct. May
   23, 2023) ................................................................................................ 1

*Brown v. Cedars-Sinai Health Sys.*,
   2023 WL 3095551 (C.D. Cal. Apr. 26, 2023) ..................................... 19

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001) ...................................................................... 48, 49

*Butler v. Coast Elec. Power Ass'n*,
   926 F.3d 190 (5th Cir. 2019) .............................................................. 29

*Caver v. Cent. Ala. Elec. Coop.*,
   845 F.3d 1135 (11th Cir. 2017) .................................................... 25, 29

*Cessna v. Rea Ener. Coop., Inc.*,
   753 F. App'x 124 (3d Cir. 2018) ........................................................ 29

*Colorado v. Symes*,
   286 U.S. 510 (1932) ......................................................................... 23

*In re Commonwealth's Mot. to Appoint Couns. Against or
   Directed to Def. Ass'n of Philadelphia*,
   790 F.3d 457 (3d Cir. 2015) ................................................. 34, 42, 49

*Crouch v. Saint Agnes Med. Ctr.*,
   2023 WL 3007408 (E.D. Cal. Apr. 19, 2023) .................................... 19

*Doe v. BJC Health System*,
   89 F.4th 1037 (8th Cir. 2023) ................................................... *passim*

*Doe v. Cape Cod Healthcare, Inc.*,
   No. 1:23-cv-10080, slip op. at ECF No. 10 (D. Mass. Jan.
   25, 2023) ........................................................................................... 19

*Doe v. Hoag Mem. Presbyterian Hosp.*,
   2023 WL 3197716 (C.D. Cal. May 2, 2023) ..................................... 19

*Doe v. ProMedica Health Sys., Inc.*,
   2020 WL 7705627 (N.D. Ohio Oct. 30, 2020), *interlocutory
   appeal denied,* 2020 WL 7705713 (N.D. Ohio Dec. 14,
   2020) ................................................................................................. 19

*Doe v. UPMC*,
   2020 WL 4381675 (W.D. Pa. Jul. 31, 2020), *interlocutory
   appeal denied*, 2020 WL 5742685 (W.D. Pa. Sept. 25,
   2020) ............................................................................. 19, 27, 31, 48

*Goncalves By & Through Goncalves v. Rady Children's Hosp.
   San Diego*,
   865 F.3d 1237 (9th Cir. 2017) ......................................................... 43

*Graves v. 3M Co.*,
   17 F.4th 764 (8th Cir. 2021) ........................................................... 46

*Ill. Ins. Guar. Fund v. Becerra*,
  33 F.4th 916 (7th Cir. 2022) ............................................................. 22

*Isaacson v. Dow Chem. Co.*,
  517 F.3d 129 (2d Cir. 2008) .................................................. 25, 33, 43

*Jacks v. Meridian Resource Co. LLC*,
  701 F.3d 1224 (8th Cir. 2012) ........................................................... 35

*Jefferson Cty., Ala. v. Acker*,
  527 U.S. 423 (1999) ........................................................................... 46

*Jennifer Fleece v. Board of Trustees of the Hancock Regional Hospital*,
  Case No. 1:23-cv-01235-MPB-TAB (S.D. Ind. July 14, 2023) ................................................................................................. 3

*Jennifer Fleece v. Board of Trustees of the Hancock Regional Hospital*,
  Case No. 49D01-2305-PL-020713 (Mar. Cty. Sup. Ct. May 23, 2023) ................................................................................................. 3

*John Doe v. Sarah Bush Lincoln Health Center*,
  Case No. 2023LA26 (Coles Cty. Ill. June 27, 2023) ............................ 2

*John Doe v. Sarah Bush Lincoln Health Center*,
  No. 2:23-cv-02170-CSB-EIL (C.D. Ill. Aug. 7, 2023) ........................... 2

*Kaitlin Lamarr v. Goshen Health System, Inc. d/b/a Goshen Health*,
  Case No. 49D01-2305-PL-021530 (Mar. Cty. Sup. Ct. May 26, 2023) ............................................................................................ 1, 2

*Kaitlin Lamarr v. Goshen Health System, Inc. d/b/a Goshen Health*,
  No. 1:23-cv-01173-JRS-MJD (S.D. Ind. July 5, 2023) .......................... 2

*Keith Chiaro v. The Methodist Hospitals, Inc.*,
  Case No. 1:23-cv-01051-SEB-CSW (S.D. Ind. June 16, 2023) ................................................................................................. 4

*Keith Chiaro v. The Methodist Hospitals, Inc.*
   Case No. 49D01-2305-PL-017931 (Mar. Cty. Sup. Ct. May
   3, 2023) .................................................................................................. 4

*Lamar, Archer & Cofrin, LLP v. Appling*,
   138 S. Ct. 1752 (2018) ........................................................................ 43

*Latiolais v. Huntington Ingalls, Inc.*,
   951 F.3d 286 (5th Cir. 2020) .............................................................. 43

*Martin v. LCMC Health Holdings, Inc.*,
   Case No. 2:23-cv-00411 (E.D. La. 2023) ........................................... 20

*Maryland v. Soper (No. 1)*,
   270 U.S. 9 (1926) ................................................................................. 23

*Mohr v. The Trustees of the Univ. of Penn.*,
   2023 WL 3044594 (E.D. Pa. Apr. 20, 2023) ...................................... 20

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ............................................................................. 28

*Panther Brands, LLC v. Indy Racing League, LLC*,
   827 F.3d 586 (7th Cir. 2016) .............................................................. 33

*Papp v. Fore-Kast Sales Co., Inc.*,
   842 F.3d 805 (3d Cir. 2016) ............................................................... 34

*Quinto v. The Regents of the Univ. of Cal.*,
   2023 WL 1448050 (N.D. Cal. Feb. 1, 2023) ...................................... 19

*Ruppel v. CBS Corp.*,
   701 F.3d 1176 (7th Cir. 2012) ...................................................... 24, 32

*Sawyer v. Foster Wheeler LLC*,
   860 F.3d 249 (4th Cir. 2017) ......................................................... 33, 43

*Smith v. Facebook*,
   745 F. App'x 8 (9th Cir. 2018) ..................................................... 47, 48

*United States v. Todd*,
   245 F.3d 691 (8th Cir. 2001) .............................................................. 46

*Valladolid v. Mem. Health Servs.*,
 2023 WL 4236179 (C.D. Cal. June 27, 2023) ..................................... 19

*Watson v. Philip Morris Companies*,
 551 U.S. 142 (2007) ...................................................................... *passim*

*Willingham v. Morgan*,
 395 U.S. 402 (1969) .............................................................. 22, 23, 24

**Statutes**

28 U.S.C. § 1291 ............................................................... 1, 2, 3, 4

28 U.S.C. § 1442 .............................................................. *passim*

28 U.S.C. § 1447(d) ......................................................... 1, 2, 3, 4

42 U.S.C. § 300jj-11(3)(A) ..................................................... 9

42 U.S.C. § 300jj-11(a) ......................................................... 9

42 U.S.C. § 300jj-11(c)(5) ..................................................... 15

42 U.S.C. § 1395w-4(o) ........................................................ 10

Act of July 13, 1866, ch. 184, § 67, 14 Stat. 171 ..................... 23

Cal. Civ. Code § 1798.91 (2014) ..................................... 47, 48

**Rules**

Fed. R. Civ. P. 8(a) ............................................................. 22

**Other Authorities**

42 C.F.R. § 495.20(f)(12)(i)(B) ......................................... 11, 12

45 C.F.R. § 160.103 ........................................................... 47

45 C.F.R. § 170.102 ........................................................ 14, 15

45 C.F.R. § 170.314(e)(1)(i) ................................................ 13

75 Fed. Reg. 144, 44,314 (Jul. 28, 2010) ................. 11, 15, 16, 17

https://www.cms.gov/about-cms/web-policies-important-
   links/web-policies/privacy ................................................................. 45

META, *What is the Meta Pixel?*, available at
   https://www.facebook.com/business/tools/meta-pixel (last
   visited Oct. 23, 2023) .......................................................................... 18

ONC Patient Engagement Playbook, available at
   https://www.healthit.gov/playbook/pe/ (last visited Feb.
   20, 2024) ............................................................................... 36, 37, 39

REBECCA MITCHELL COELIUS, *Get the facts regarding view,
   download and transmit 2014 requirements*, HealthITbuzz,
   The Latest on Health IT from the ONC, at pg. 1 (Jan. 31,
   2014), available at https://www.healthit.gov/buzz-
   blog/meaningful-use/view-download-transmit-facts (last
   visited Jan. 31, 2014) ................................................................... 12, 13

# JURISDICTIONAL STATEMENTS

## *Brian Elkins and Annie Elkins v. Southeastern Indiana Health Management Inc. d/b/a Columbus Regional Health,* Case No. 23-3159

On May 23, 2023, Plaintiffs filed the action in the Indiana Commercial Court, Marion County, Indiana. *Brian Elkins and Annie Elkins v. Southeastern Indiana Health Management Inc. d/b/a Columbus Regional Health*, Case No. 49D01-2305-PL-020792. On June 26, 2023, Defendant timely removed the action to the United States District Court for the Southern District of Indiana pursuant to 28 U.S.C. § 1442(a)(1). *Brian Elkins and Annie Elkins v. Southeastern Indiana Health Management Inc. d/b/a Columbus Regional Health*, Case No. 1:23-cv-01117-JRS-TAB (S.D. Ind. June 26, 2023). Following Plaintiffs' motion to remand, the District Court entered its order remanding the case on October 10, 2023. *Id.* ECF No. 30. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 and 28 U.S.C. § 1447(d), which expressly permit review of remand orders in cases removed pursuant to 28 U.S.C. § 1442.

## *Kaitlin Lamarr v. Goshen Health System, Inc. d/b/a Goshen Health,* Case No. 23-3175

On May 26, 2023, Plaintiff filed the action in the Indiana

Commercial Court, Marion County, Indiana. *Kaitlin Lamarr v. Goshen Health System, Inc. d/b/a Goshen Health,* Case No. 49D01-2305-PL-021530. On July 5, 2023, Defendant timely removed the action to the United States District Court for the Southern District of Indiana pursuant to 28 U.S.C. § 1442(a)(1). *Kaitlin Lamarr v. Goshen Health System, Inc. d/b/a Goshen Health*, No. 1:23-cv-01173-JRS-MJD (S.D. Ind. July 5, 2023). Following Plaintiff's motion to remand, the District Court entered its order remanding the case on October 12, 2023. *Id.* ECF No. 33. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 and 28 U.S.C. § 1447(d), which expressly permit review of remand orders in cases removed pursuant to 28 U.S.C. § 1442.

## *John Doe v. Sarah Bush Lincoln Health Center,* Case No. 23-3340

On June 27, 2023, Plaintiff filed the action in the First Judicial Circuit Court of Coles County, Illinois. *John Doe v. Sarah Bush Lincoln Health Center,* Case No. 2023LA26. On August 7, 2023, Defendant timely removed the action to the United States District Court for the Central District of Illinois pursuant to 28 U.S.C. § 1442(a)(1). *John Doe v. Sarah Bush Lincoln Health Center*, No. 2:23-cv-02170-CSB-EIL (C.D. Ill. Aug. 7, 2023). Following Plaintiff's motion to remand, the District

2

Court entered its order remanding the case on November 13, 2023. *Id.*

ECF No. 15. This Court has jurisdiction over this appeal under 28

U.S.C. § 1291 and 28 U.S.C. § 1447(d), which expressly permit review of

remand orders in cases removed pursuant to 28 U.S.C. § 1442.

### *Jennifer Fleece v. Board of Trustees of the Hancock Regional Hospital*, Case No. 23-3363

On May 23, 2023, Plaintiff filed the action in the Marion County

Superior Court of Marion County, Indiana. *Jennifer Fleece v. Board of*

*Trustees of the Hancock Regional Hospital,* Case No. 49D01-2305-PL-

020713. On July 14, 2023, Appellant timely removed this action to the

United States District Court for the Southern District of Indiana.

*Jennifer Fleece v. Board of Trustees of the Hancock Regional Hospital*,

Case No. 1:23-cv-01235-MPB-TAB (S.D. Ind. July 14, 2023). Following

Plaintiff's motion to remand, the district court entered its order

remanding the case on November 17, 2023. *Id.* ECF. No. 35. This Court

has jurisdiction over this appeal under 28 U.S.C. § 1291 and 28 U.S.C.

§ 1447(d), which expressly permit review of remand orders in cases

removed pursuant to 28 U.S.C. § 1442.

### *Keith Chiaro and Jane Doe v. Methodist Hospitals, Inc.*, Case No. 23-3385

On May 3, 2023, Plaintiff Keith Chiaro filed the action in the Indiana Commercial Court, Marion County, Indiana. *Keith Chiaro v. The Methodist Hospitals, Inc.* Case No. 49D01-2305-PL-017931. On June 16, 2023, Defendant timely removed the action to the United States District Court for the Southern District of Indiana pursuant to 28 U.S.C. § 1442(a)(1). *Keith Chiaro v. The Methodist Hospitals, Inc.*, Case No. 1:23-cv-01051-SEB-CSW (S.D. Ind. June 16, 2023). Following Plaintiff's motion to remand, the District Court entered its order remanding the case on November 29, 2023. *Id.* ECF No. 52. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 and 28 U.S.C. § 1447(d), which expressly permit review of remand orders in cases removed pursuant to 28 U.S.C. § 1442.

## STATEMENT OF ISSUES

Two decades ago, federal authorities set out to create a nationwide system of easily accessible electronic health records, including making these health records immediately available online to patients. The United States does not have nationalized healthcare, so that federal undertaking fell to health care providers like Appellants (the "Healthcare Providers") responding to federal guidance and initiatives.

As a direct result—and in a growing nationwide trend—Plaintiffs (the "Website Visitors") have filed suit against those healthcare providers, alleging that their health data is now subject to web trackers, known as "Pixels." The Healthcare Providers have been sued under this theory, including for alleged privacy violations that occur under Indiana or Illinois state law at the precise moment when an individual clicks on the link to access their patient portal accounts.

The Healthcare Providers sought federal officer removal, alleging a direct connection between their participation in the federal initiative and the lawsuits that resulted. The District Courts disagreed, and the Healthcare Providers appealed as of right. The issues are:

1. Did the District Courts err by failing to liberally construe the federal officer removal statute in favor of the federal forum?

2. Did the District Courts err in failing to find a relationship between the Healthcare Providers and the federal government, sufficient for removal under 28 U.S.C. § 1442(a)(1), based on an uncontested course of dealing whereby Healthcare Providers assist the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS") with the establishment of a

nationwide system of interoperable health information technology, including the ability for patients to immediately access their health information online?

3. Did the District Court err as a matter of law in distinguishing between contractors who are paid fixed amounts for services to the federal government and those paid on an incentive and penalty based model for the purposes of removal under 28 U.S.C. § 1442(a)(1)?

## STATEMENT OF THE CASE

### A.     The Website Visitors' Petitions Allege Privacy Violations on the Healthcare Provider's Publicly Available Websites.

These consolidated appeals present an important subject matter jurisdiction issue: whether Healthcare Providers may avail themselves of the federal officer removal statute when the complained-of conduct relates directly to their actions in response to federal directives and policies taken as part of a federal health information technology mission beginning in 2004. 28 U.S.C. § 1442(a).

The five consolidated complaints at issue are nearly verbatim copies of each other, literally. The complaints are part of a deluge of litigation that has flooded the state and federal courts following the

publication of an article allegedly exposing privacy violations on healthcare provider websites. In general, the suits allege privacy violations based on the use of certain Facebook source code on Healthcare Providers' public websites and patient portals that help drive visitor traffic and analyze where that traffic came from. ROA.0025-0026; ROA.0209-210; ROA.0610-0611; ROA.0954-0955; ROA.1317-1318. Plaintiffs allege that the Healthcare Providers offered certain website functions to patients and the public to do things like search for clinicians, investigate health issues, and pay hospital bills, and that when those functions are utilized by website users, sensitive information is collected. ROA.0027 ¶ 5; ROA.211 ¶ 5; ROA.0612 ¶ 5; ROA.0956 ¶ 5; ROA.1319 ¶ 6. Plaintiffs also uniformly allege that the Healthcare Providers disclose this collected sensitive information without Plaintiffs' knowledge, authorization, or consent for digital marketing purposes through the use of source code known as a Meta Pixel. *See* ROA.0027 ¶ 6; ROA.211 ¶ 7; ROA.0612 ¶ 7; ROA.0956 ¶ 7; ROA.1319 ¶ 7.

**B.    The Website Providers' Actions in Making Health Information Technology Accessible from Websites Was in Direct Furtherance of Federal Policy.**

The Website Providers' public- and patient-facing web platforms are designed to achieve the federal government's directives to healthcare providers to increase patient interaction with personal electronic health records ("EHRs") and other health technology.

1.    *President George W. Bush Establishes the Position of National Health Information Technology Coordinator.*

In 2004, President Bush ordered the Secretary of HHS to establish within the Office of the Secretary the position of National Health Information Technology Coordinator ("National Coordinator"). ROA.0798-ROA.0800. Through this Executive Order, President Bush directed that the National Coordinator shall "develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors that will reduce medical errors, improve quality, and produce greater value for health care expenditures." ROA.0799 § 3.

2.    *Congress Uses Financial Incentives and Penalties to Ensure That Healthcare Providers Make Health Records and Information Available Online.*

The President was not alone in taking this action. Five years later Congress recognized that the private sector and hundreds of millions of dollars of incentives were critical to accomplishing the mission of modernizing the Nation's health information technology infrastructure. In 2009, Congress passed the Health Information Technology Act ("HITECH Act"), which codified the Office of the National Coordinator for Health Information Technology. *See* 42 U.S.C. § 300jj-11(a); PUB. L. 111-5, Title XIII, 123 Stat. 264 (Feb. 17, 2009).

As with President Bush's Executive Order, Congress tasked the National Coordinator with a series of responsibilities under federal law, including to "update the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics" with respect to each of the following: "(i) [t]he electronic exchange and use of health information and the enterprise integration of such information," as well as "(vii) [s]trategies to enhance the use of health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(3)(A) (Strategic plan).

Congress further codified a series of incentive payments for HHS, in conjunction with CMS, for health care providers in exchange for their

adoption of health information technology. *See* 42 U.S.C. § 1395w-4(o) (Incentives for adoption and meaningful use of certified EHR technology); *see also* C. Stephen Redhead, *The Health Information Technology for Economic and Clinical Health (HITECH) Act*, at pg. 2, CONG. RES. SERV. (Apr. 27, 2009) (discussing various financial incentives).

As the Congressional Research Service explained at the time, "the legislation provides Medicare incentive payments to encourage doctors and hospitals to adopt and use certified EHR. Those incentive payments are phased out over time and replaced by financial penalties for physicians and hospitals that are not using certified EHRs." *Id.* The Congressional Research Service also noted that "[t]he most important barriers to [health information technology] adoption include the high implementation and maintenance costs, the limited financial incentives for using [health information technology], and the lack of interoperability." *Id.* at p. 1. A lack of interoperability means the inability "of [information technology] systems to share and use electronic information." *Id.* at fn. 2.

3.     *The National Coordinator Makes Online Access to Health Information a Key Component of the Meaningful Use Regulations.*

The following year, the Department announced the Meaningful Use Program ("MUP"), which became "the centerpiece of the government's health IT strategy" through which it would enlist and incentivize private healthcare providers to develop online tools for patients to access and use their electronic health records. *See* DEPARTMENT OF HEALTH & HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES, Medicare and Medicaid Programs; Electronic Health Record Incentive Program, 75 Fed. Reg. 144, 44,314 (Jul. 28, 2010). In the final MUP regulations, the agencies stated: "Certified EHR technology used in a meaningful way is one piece of a broader [health information technology] infrastructure *needed to reform the health care system* and *improve health care quality, efficiency, and patient safety*." *Id.* at 44,321 (emphasis added).

One central component of the meaningful use regulations was the ability for patients to access health information online immediately, which necessarily compels the creation of provider-based web platforms. *See* 42 C.F.R. § 495.20(f)(12)(i)(B) ("Beginning in 2014, provide patients

11

with the ability to view online, download, and transmit information about a hospital admission."); *see also id.* at (ii)(B) (same); REBECCA MITCHELL COELIUS, *Get the facts regarding view, download and transmit 2014 requirements*, HealthITbuzz, The Latest on Health IT from the ONC, at pg. 1 (Jan. 31, 2014), available at https://www.healthit.gov/buzz-blog/meaningful-use/view-download-transmit-facts (last visited Jan. 31, 2014) ("All providers and hospitals attesting to Meaningful Use in 2014 will need to implement the [view, download, and transmit] capabilities for their patients. Those in Stage 1 will attest for *access*, those in Stage 2 will attest for *use*. The term 'online access' used in the [view, download, and transmit] measure definitions refers to all three capabilities – view, download and transmit.") (emphasis in original).

As the National Coordinator found in the federal government's first health IT strategic plan, published in 2011, "only 7 percent of Americans have used a web site to access their health information online." ROA.0423. The low rates were attributed to lack of awareness, technology access hardships, and a general lack of consumer initiative

in health care. *Id.* "As a result, [consumers] have not created a robust marketplace for technology innovation." *Id.*

The National Coordinator's report thus concluded: "To truly empower consumers and move the health care system to become more patient-centered, *the government will need to help change these dynamics*." *Id.* (emphasis added). *See also, e.g.*, Joan Neuner, MD, MPH, *et al.*, Meaningful Use and the Patient Portal: Patient enrollment, use and satisfaction with patient portals at a later-adopting center, AM. J. MED. QUAL. (Mar. 2015), at pg. 1 ("only 28% of physicians reported having EHRs that allowed patient access to records. Despite this, the architects of the MU rules have set the high bar for patient EHR access and communication.").

4.    *The Federal Government Compels Healthcare Providers' Compliance Through "Meaningful Use" Directives.*

The regulations require healthcare providers to attest to the National Coordinator and to CMS on their progress with respect to these "view, download and transmit" criteria in particular. *See* 45 C.F.R. § 170.314(e)(1)(i) (requiring reporting on "Patient engagement" for "[v]iew, download, and transmit to 3d party"; "EHR technology must

13

provide patients (and their authorized representatives) with an online means to view, download, and transmit to a 3d party the data specified below," including "[t]he Common [Meaningful Use] Data Set"); 45 C.F.R. § 170.102 (Definitions) (defining the term "Common [Meaningful Use] Data Set" to include "[S]moking status," "[M]edications," "[M]edication allergies," "[L]aboratory tests," "[L]aboratory value(s)/result(s)," "[V]ital signs," "[c]are plan field(s), including goals and instructions," and "[P]rocedures").

Thus, Plaintiffs' complaints alleging uniform privacy violations against the Healthcare Providers are in tension with expressed federal governmental policy, implemented through the Medicare and Medicaid programs. The federal government determined that "[o]nline resources, including advice from peers, are a significant source of health information." ROA.0428. "Consumers have expressed interest in the use of health IT tools to make sure their health record is correct, review test results, email providers, schedule appointments online, and refill prescriptions online, all of which lend themselves to more patient-centered care." ROA.0428-0429. In connection with this online, interoperable mission, the federal government directed health care

14

providers to make online patient portals available to patients.

ROA.0792 ("You will have better success meeting meaningful use

requirements … if you integrate a patient portal effectively into your

practice operations."); ROA.0860 ("[T]his is a shared undertaking.

Efforts of . . . ***private stakeholders*** are vital to ensure that health

information is available when and where it matters most to improve

and protect people's health and well-being." (emphasis added)). The

National Coordinator, in its patient engagement fact sheet, directed

healthcare providers to "understand the elements of an effective portal

program and apply them to the specific needs of your practice," so that

the "[p]ortal [e]ngages [p]atients." ROA.0792. The National

Coordinator's recommended actions included learning the benefits of

patient portals, "implement[ing] proactive, engaging portal features"

and "actively promot[ing] and facilitat[ing] portal use." *Id.*

The federal government further told healthcare providers what

they should do to provide the patient portals to patients and their

caretakers. *See* 42 U.S.C. § 300jj-11(c)(5) (Certification); DEPARTMENT

OF HEALTH & HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID

SERVICES, *Medicare and Medicaid Programs; Electronic Health Record*

*Incentive Program*, 75 Fed. Reg. 144, 44,314 (Jul. 28, 2010) ("Under all three EHR incentive programs, EPs, eligible hospitals, and CAHs must utilize 'certified EHR technology' if they are to be considered eligible for the incentive payments."). In the final MUP regulations, HHS regarded EHR technology as a critical component of the incentive program and charged the National Coordinator with developing a criteria and plan for expanding and certifying EHR technology. *Id.*

> 5.   *The Healthcare Providers Assisted the Federal Government By Making Health Information Immediately Available Online.*

The Healthcare Providers operated their websites and patient portals, and continue to operate their websites and patient portals, to assist the federal government in achieving the goal of increased patient engagement with health information technology and records. The Healthcare Providers are long-time providers of services to Medicare and Medicaid enrollees and have participated in the MUP since its inception. ROA.0385-0386; ROA.0795-0797; ROA.1090-1091; ROA.1465-1466. The Healthcare Providers created interactive, publicly available websites, and reported patient participation to the federal government. *Id.* These reports are made specifically to satisfy MUP requirements

16

and include submissions regarding the Healthcare Providers' websites, their patient portals, and usage of both. *Id.* CMS reviews these reports and measures the Healthcare Providers' compliance with MUP requirements. *Id.*

Since the MUP's inception, the Healthcare Providers have consistently satisfied the National Coordinator's requirements. *Id.* Initially, the Healthcare Providers received incentive payments from the federal government for use of health information technology. Today, as the MUP progressed and payments phased out, the Healthcare Providers successfully avoid penalties to their fee-for-service reimbursements by complying with the MUP.

The Healthcare Providers achieved these results because they designed the websites to drive visitor traffic to, and promote patient interaction with, their various health care web pages. *Id.* Importantly, Plaintiffs do not allege any Meta Pixel, or like code, inside the password-protected patient portal, which patients use to view and access EHRs. On public-facing web pages, not login-protected areas, the Healthcare Providers achieve patient engagement results, in part, because of technologies like the Meta Pixel. The Meta Pixel is a common

website analytics tool which helps optimize website traffic for webpage visitors. Meta, formerly Facebook, offers the pixel code for website owners to integrate into their sites to assist in advertising and driving online visitor traffic. ROA.0027; ROA.0296; ROA.0612-0613; ROA.0957; ROA.1320; *see also* META, *What is the Meta Pixel?*, available at https://www.facebook.com/business/tools/meta-pixel (last visited Oct. 23, 2023). Under Plaintiffs' own allegations, the Healthcare Providers used the Meta Pixel on public-facing web pages to understand the traffic on their websites, increase patient engagement, ensure achievement of the types of meaningful use sought by the federal government, and report compliance to the federal government. *Id.*

## C. The Healthcare Providers Remove and the District Courts Order Remand.

Based on these allegations and claims, the Healthcare Providers removed Plaintiffs' petitions to federal court under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). Plaintiffs' lawsuits challenge the Healthcare Providers' decisions to integrate the Meta Pixel into their public-facing website and use the Meta Pixel and other analytics tools to drive public and patient access to health information technology, including specifically with respect to alleged privacy

18

violations when an individual clicks on the Healthcare Providers'
patient portal link.

The district courts disagreed, in accord with the growing wave of
precedent rejecting federal officer removal under these circumstances.
*See, e.g., Doe v. Cape Cod Healthcare, Inc.*, No. 1:23-cv-10080, slip op. at
ECF No. 10 (D. Mass. Jan. 25, 2023); *Quinto v. The Regents of the Univ.
of Cal.*, 2023 WL 1448050, at *5 (N.D. Cal. Feb. 1, 2023); *Brown v.
Cedars-Sinai Health Sys.*, 2023 WL 3095551, at *3 (C.D. Cal. Apr. 26,
2023) (Fischer, J.); *Crouch v. Saint Agnes Med. Ctr.*, 2023 WL 3007408,
at *3 (E.D. Cal. Apr. 19, 2023); *Doe v. Hoag Mem. Presbyterian Hosp.*,
2023 WL 3197716, at *3 (C.D. Cal. May 2, 2023); *Valladolid v. Mem.
Health Servs.*, 2023 WL 4236179, at *5 (C.D. Cal. June 27, 2023); *but cf.
Doe v. UPMC*, 2020 WL 4381675 (W.D. Pa. Jul. 31, 2020), *interlocutory
appeal denied*, 2020 WL 5742685 (W.D. Pa. Sept. 25, 2020); *Doe v.
ProMedica Health Sys., Inc.*, 2020 WL 7705627 (N.D. Ohio Oct. 30,
2020), *interlocutory appeal denied,* 2020 WL 7705713 (N.D. Ohio Dec.
14, 2020) (allowing removal of healthcare provider website privacy
complaints under the Meaningful Use Program).

Several of these remand orders are now on appeal to other circuit

courts of appeal. *See, e.g.*, *Mohr v. The Trustees of the Univ. of Penn.*, 2023 WL 3044594 (E.D. Pa. Apr. 20, 2023), *on appeal*, Case No. 23-1924 (3d Cir.); *Martin v. LCMC Health Holdings, Inc.*, Case No. 2:23-cv-00411 (E.D. La. 2023), *on appeal*, Case No. 23-30522 (5th Cir.). The only appellate court that has thus far weighed in on the issue likewise denied removal, in an opinion that will be addressed later in this brief. *See Doe v. BJC Health System*, 89 F.4th 1037 (8th Cir. 2023), *petition for rehearing denied by order dated Feb. 9, 2023*.

This case presents an opportunity for the Court to address federal officer removal in the context of the MUP and a healthcare provider's assistance with that program.

## SUMMARY OF ARGUMENT

Since the inception of the Meaningful Use Program, the federal government has directed that patients be able to access and use their health records and other health information technology tools to achieve patient care needs and objectives. The Healthcare Providers are paid or penalized by the federal government in accordance with their conduct.

The federal government unequivocally co-opted private healthcare through the MUP to build and maintain the systems through which

patients access, view, download, and transmit their EHRs—the hallmarks of meaningful use and interoperability, as defined by the federal government.

The federal government oversees compliance with MUP initiatives through required reporting and financial incentives and penalties. The Healthcare Providers must show not only that they have taken steps in furtherance of these federal initiatives but must demonstrate meaningful patient engagement with health information technologies. The Healthcare Providers shortcoming or failure to comply means negative financial consequences.

To ensure compliance with MUP requirements, the Healthcare Providers took steps to make patients aware of their websites, to show the benefits and options available to patients on their websites, and to make the technologies easy for patients to use. ROA.0385-0386; ROA.0795-0797; ROA.1090-1091; ROA.1465-1466. The Healthcare Providers' steps included developing and using technologies—like the Meta Pixel—to drive web traffic to sites. All of these actions serve to comply with federal directives to increase patient engagement with health information technology and records, including in particular the

21

ability to view their health information directly online. The federal

officer removal statute, which must be broadly construed as a matter of

law, thus entitles the Healthcare Providers to defend against

allegations of injury relating to these activities in a federal forum.

## ARGUMENT

### A.    Standard of Review.

"We review dismissal for lack of federal jurisdiction de novo and a

court's findings on jurisdictional facts for clear error." *Ill. Ins. Guar.*

*Fund v. Becerra*, 33 F.4th 916, 922 (7th Cir. 2022). "[T]he standard in

assessing removal allegations under § 1442(a) starts with Rule 8(a)'s

short and plain statement requirement." *Betzner v. Boeing Co.*, 910 F.3d

1010, 1014 (7th Cir. 2018).

### B.    The Purpose of the Federal Officer Removal Statute is to Protect Federal Interests.

"Congress enacted the original federal officer removal statute near

the end of the War of 1812." *Watson v. Philip Morris Cos.*, 551 U.S. 142,

147 (2007). The initial statute was "obviously an attempt to protect

federal officers [and any other person aiding or assisting them] from

interference by hostile state courts." *Id.* (internal quotations and

alterations omitted) (citing *Willingham v. Morgan*, 395 U.S. 402, 405

22

(1969)). From its original form, the federal officer removal statute has evolved and expanded beyond its original context from only federal officers to "any person" acting under them. *See* Act of June 25, 1948, ch. 646, § 1442(a), 62 Stat. 938, 28 U.S.C. § 1442(a) (dropping revenue limitation); Act of July 13, 1866, ch. 184, § 67, 14 Stat. 171 (permitting removal of a suit against "any person acting under . . ."). As the United States Supreme Court noted, the purpose of the statute is not hard to discern: "[s]tate-court proceedings may reflect 'local prejudice' against unpopular federal laws or federal officials." *Watson*, 551 U.S. at 150 (quoting *Maryland v. Soper (No. 1)*, 270 U.S. 9, 32 (1926)) (citing *Willingham*, 395 U.S. at 406. "Where a private person acts as an assistant to a federal official in helping that official to enforce federal law, some of these same considerations may apply." *Watson*, 551 U.S. at 151.

The Supreme Court regards the federal officer removal statute as "broad" and directs that it be "liberally construed" in favor of federal jurisdiction. *Watson*, 551 U.S. at 147 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)); 28 U.S.C. § 1442(a)(1). To successfully remove under the statute, the Healthcare Providers must (1) show that they are

"(1) 'person[s]'[1] (2) 'acting under' the United States, its agencies, or its officers (3) that ha[ve] been sued 'for or relating to any act under color of such office,' and (4) ha[ve] a colorable federal defense to the plaintiff's claim." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180-81 (7th Cir. 2012), quoting 28 U.S.C. § 1442(a).

### C. The Healthcare Providers Are "Acting Under" the Direction of a Federal Officer.

To act under a federal officer, a private entity must be involved in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior," through a relationship that "typically involves subjection, guidance, or control." *Watson*, 551 U.S. at 151–52 (citation omitted). The "words 'acting under' are broad" and, like the statute itself, "must be liberally construed" in favor of removal. *Id.* at 151. "The Supreme Court's jurisprudence teaches that the policy in favor of federal officer removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" *Baker v. Atlantic Richfield Co.*, 962 F.3d 937, 943 (7th Cir. 2020) (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)).

Here, the district courts held that the Healthcare Providers were

---

[1] No party disputes that the Healthcare Providers are "persons" under 28 U.S.C. § 1442(a)(1).

not "acting under" the federal government by operating their websites, but wholly ignored the broader context of the Healthcare Providers' conduct and financial interactions with the federal government. ROA.0181, ROA.0578; ROA.0927; ROA.1283; ROA.1659. The Supreme Court held that an "acting under" relationship includes, but is not limited to, those established by contract, payment, employer-employee relationships, and agent-principal arrangements. *Watson*, 551 U.S. at 156; *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1143 (11th Cir. 2017) (applicable federal regulations "demonstrate the close and extensive relationship … as well as [the government's] significant level of control over [the private entity's] operations."); *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008) ("Unlike the tobacco companies in *Watson*, Appellant received delegated authority; they were not simply regulated by federal law.").

Removal is appropriate where the defendant assists the government in producing something it want or needs. *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 942 (7th Cir. 2020) (citing *Watson*, 551 U.S. at 153). Thus, the proper inquiry is whether the private entity's assistance goes "beyond simple compliance with the law" and helps the

government "fulfill … basic governmental tasks." *Id.* at 153.

The Healthcare Providers' participation in the MUP fits well within this framework. They assisted HHS and two of its subdivisions (the National Coordinator and CMS) in building and maintaining the nationwide system of patient-accessible EHRs envisioned by President Bush nearly twenty years ago, a task so important to the federal government that it created a federal officer position and passed sweeping funding legislation to implement the program. The Healthcare Providers complied with a federal government initiative that involves strict oversight by HHS and carries payment and penalties to facilitate the government's objectives. The nationwide system of EHRs is not something the Healthcare Providers decided to produce, but that the government then regulated (unlike the cigarettes in Watson). The government wanted the nationwide system of EHRs, and the Healthcare Providers produced it in response to that initiative.

1.    *The Federal Government's Incentive Payments Highlight the Healthcare Providers' "Acting Under" Relationship.*

The Healthcare Providers did not pursue the federal government's objectives under the MUP merely because of government regulation or

financial incentive. The government established a robust incentive and oversight system that rewards compliance and/or penalizes non-compliance, all with the objective of creating a national health information technology infrastructure. Since the inception of the MUP, the Healthcare Providers, as if acting pursuant to a contract, applied for and received funds from HHS for participation. ROA.0385-0386; ROA.0795-0797; ROA.1090-1091; ROA.1465-1466. These funds were the result of the Healthcare Providers' submissions of "Promoting Interoperability" reports regarding progress on the MUP objectives. *Id.* These reports allow HHS to evaluate the Healthcare Providers' assistance to the federal government, including efforts to facilitate patient engagement online. *Id.* Providers that fail to meet HHS's goals are penalized in the form of reduced fee-for-service reimbursements.

Payment arrangements like this are one way in which the federal government enlists private entities and enlists "*to assist*, or help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152, 156. The payments and penalties evidence actions taken by private actors in response to a federal officer's directives. *Watson*, 551 U.S. at 153, 156; *UPMC*, 2020 WL 4381675, at *6 (that "the government offers

payment in exchange for [hospital's] voluntary participation in implementing a nationwide [EHR] network shows the relationship" is akin to a "government contractor relationship"). By implementing a system in which funds would be withheld for a failure to satisfy federal policy objectives, the federal government controls the actions of the Healthcare Providers. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578–79 (2012) (recognizing that withholding funds can be a form of compulsion).

The district courts' analyses of the Healthcare Providers' relationships with the federal government runs at odds with Supreme Court and Seventh Circuit precedent for liberal interpretation of the federal officer removal statute. *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) ("[R]emoval should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)."). Moreover, the Supreme Court in *Watson* directed district courts to look for evidence of payment to establish the "acting under" prong. *Watson*, 551 U.S. at 156 (noting, for Philip Morris, no "evidence of any contract, ***any payment***, any employer/employee relationship, or any principle/agent relationship."). The district courts' narrow interpretations, which essentially limit the

28

statute to independent contractors, betrays the letter and the spirit of the rule. *Caver*, 845 F.3d at 1138 ("Congress and the President designed a system by which the [Rural Electrification Act] would [provide electricity to rural areas] by loaning money to state entities, which would carry out these objectives under the REA's *close supervision*." (emphasis added)); *Butler v. Coast Elec. Power Ass'n*, 926 F.3d 190, 201 (5th Cir. 2019); *Cessna v. Rea Ener. Coop., Inc.*, 753 F. App'x 124, 127 (3d Cir. 2018). The Supreme Court intentionally bootstrapped *close supervision* when it answered the question "why, if close supervision is sufficient to turn a private contractor into a private firm 'acting under' a Government 'agency' or 'officer,' does it not do the same when a company is subjected to intense regulation." *Watson*, 551 U.S. at 153. "The answer to this question lies in the fact that the private contractor in such cases is helping the Government to produce an item that it needs. The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks." *Id.*

Here, the Healthcare Providers are not invoking federal officer removal as "highly regulated firm[s]" merely complying with "federal

laws, rules, and regulations." *Watson*, 551 U.S. at 153. Instead, the

Healthcare Providers are fulfilling a basic, fundamental federal

governmental task: creating a national health information technology

infrastructure and providing patients access to healthcare records

online through CMS programs. HHS directs and financially incentivizes

Healthcare Providers' participation in the MUP and measures the

success of that participation by reviewing progress reports from the

Healthcare Providers. The National Coordinator put it best: "[T]he

federal government signals that . . . efforts will begin to include new

sources of information . . . ." ROA.0476. And, "[t]his Plan will help guide

the nation's shift toward focusing on better health and delivery system

reform." *Id.* And, "***[e]fforts of*** . . . ***private stakeholders are vital*** to

ensure that health information is available when and where it matters

most to improve and protect people's health and well being." *Id.*

(emphasis added).

The Healthcare Providers' participation in the MUP ensures that

patients can find health care resources online and that they have access

to their EHR. This, in turn, furthers the government's clearly stated

objective of nationwide patient access to and use of modern health information technology.

>    2.    *The Healthcare Providers Assist the Federal Government with Improving Patient Access to and Engagement with Health Care Information Technology and Records.*

The assistance of private healthcare actors in the MUP did not come about due to normal market forces or industry initiative. Rather, the enactment of the HITECH Act, and the adoption of MUP regulations, both enlisted and incentivized private healthcare providers to "assist" and "help carry out" the "basic governmental task" of improving patient access to EHR. *Watson*, 551 U.S. at 152–53.

The government has been unequivocal in its objectives—it wants every citizen, including but not limited to Medicare and Medicaid beneficiaries, to have access to their EHRs and to use those records to further their healthcare needs. The federal government's interest in accessible patient EHRs is obvious: the federal government is not just the administrator of the Medicare and Medicaid programs; it is also "one of the largest purchasers of healthcare services" in the nation. *UPMC*, 2020 WL 4381675, at *5. As such, it operates its own website and patient portal for Medicare beneficiaries using similar technologies

as are at issue in this case to improve and drive traffic to its website.
ROA.0391. The government, itself, is thus uniquely interested in
ensuring a modern, accessible network of EHRs that empowers patients
and improves healthcare in the process. ROA.0394 ("In developing and
executing the federal health IT strategy, the government strives to . . .
[b]e a worthy steward of the country's money and trust." "***This means
relying to the extent possible on private markets to accomplish
important societal objectives***, and acting to correct market failures
when necessary." (emphasis added)).

     Despite the foregoing, the district courts found that the federal
government would not have used its own agents to create online portals
(even though it did just that for Medicare beneficiaries) and that the
maintenance of electronic health records is not something the
government needs like wartime goods. ROA.0181; ROA.0578;
ROA.0926; ROA.1282-1283; ROA.1658. But federal officer removal is
"not narrow or limited" in such a manner. *Ruppel* at 1180. The crux of
the inquiry is not whether the Healthcare Providers acted in place of
the government, but "whether there was a special relationship between
the defendant and the federal government." *Baker* 962 F.3d at 941. This

Court has defined the required relationship as one that is "closely monitored and highly regulated." *Id.* at 943, quoting *Panther Brands, LLC v. Indy Racing League, LLC*, 827 F.3d 586, 590 (7th Cir. 2016). This definition is in line with federal jurisprudence across the country. *Id.* at fn. 2 ("Contrary to the Residents' claims, our caselaw conforms with our sister circuits"); *see also Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 136-37 (2d Cir. 2009) (observing that 'close supervision of the private entity by the Government' may demonstrate that the entity is assisting the government); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) ('[C]ourts have unhesitatingly treated the "acting under" requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*.' (emphasis in original))."

The district courts ignored the "closely monitored and highly regulated" tasks being performed by the Healthcare Providers. In so doing, the courts ignored the 2011—2015 Federal Health Information Technology Strategic Plan. There, the federal government stated:

> All Americans should have equal access to quality health care. ***This includes the benefits conferred by health IT***. ***The government is working to create an environment of testing, learning, and improving, thereby fostering***

33

*breakthroughs that quickly and radically transform health care. The government will support innovation in health IT*.

ROA.0707 (emphasis added). The Healthcare Providers are assisting the federal government to fulfill a basic task—building and maintaining a sophisticated, innovative health information technology infrastructure to improve access to health care and records. *See Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 813 (3d Cir. 2016) (an "archetypal" example of "acting under" involved "produc[ing] an item the government needed … and that the government otherwise would have been forced to produce on its own"); *In re Commonwealth's Mot. to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 474 (3d Cir. 2015) (by representing parties in habeas petitions, community defense organization "provide[d] a service the federal government would itself otherwise have to provide," even in state court cases where defender's office was not ordered to participate by federal court).

Without the conscription of private industry, the federal government would have to go it alone to modernize the nation's EHRs and enable patient access. By co-opting providers through CMS—the

34

entities that create and hold the information in the first instance—the federal government simply found a different way to do the same job. *See Jacks v. Meridian Resource Co. LLC*, 701 F.3d 1224, 1234–35 (8th Cir. 2012).

### D. The Court Should Not Follow the Eighth Circuit's Decision in *BJC Healthcare.*

As set forth above, the only appellate court to have analyzed a similar issue is the Eighth Circuit in the case against BJC Health System. *See Doe v. BJC Health System*, 89 F.4th 1037 (8th Cir. 2023), *petition for rehearing denied by order dated Feb. 9, 2023.*

The Court should not follow the *BJC Health* decision, for the following reasons:

*First*, the *BJC Health* court did not analyze the particular claims at issue. The closest the opinion comes is to say that "plaintiffs allege that, when patients visited MyBJCHealth or MyChart, the portal shared their PHI with third-party services, including Alphabet (Google) and Meta Platforms (Facebook), which used the information for targeted online advertising." *Id.* at 1041.

Here, the Healthcare Providers are not removing this case to federal court because of alleged third-party disclosures that occurred

35

within their patient portal themselves. Rather, as set forth above, they removed these cases to federal court because plaintiffs are claiming alleged privacy violations occur on their public websites, including specifically when an individual clicks on their patient portal link.

*Second*, it is not clear what was the record before the *BJC Health* system court when it came to answering the question of federal governmental assistance. The *BJC Health* court held that "[t]he design of private websites is not—and never has been—a basic *governmental* task." *Id.* (emphasis in original). The record before the Court here, however, shows the opposite. The federal government issued an entire "Patient Engagement Playbook," which expressly told healthcare providers how to design their public websites, at least when it came to their patient portals. *See* The ONC Patient Engagement Playbook, available at https://www.healthit.gov/playbook/pe/ (last visited Feb. 20, 2024). This document includes, but is not limited to, the following instruction:

- "Keep in mind that features supporting patient engagement, like self-scheduling, are the most effective ways to encourage portal adoption." *Id.* at Introduction.

36

- "**If your practice has already established a patient portal,** use the Playbook to get ideas and tips for establishing features and policies that streamline and improve care – such as: Communicate with patients by email and share notes through the portal; Navigate proxy access with patients and their caregivers; . . . Activate features like online booking." *Id.*

- "Provide simple, secure portal signup. . .  Ideally, the patient has to enter only a few pieces of information – and the portal confirms the patient's identity on the back end." *Id.* at Chapter 1, Facilitate easy enrollment.

- Activate at least the following portal features: "Enable online booking and prescription refills," "Set up secure messaging," "Share notes" ("By offering patients access to notes through a portal, you can promote transparency and change the way people engage with their health and care")), "Connect your patients to educational and community resources" and "Support electronic records requests." *Id.* at Chapter 2: Activate portal features that meet patient needs.

- "Ensure portal access for all patients. To support all patients in accessing their health information, you can: Offer your patient portal in multiple languages; Make sure your portal is mobile-friendly, and that the pages load quickly, so that users with limited data or slow connections can still access it; Check that your portal is easy to navigate for patients who use screen readers or other assistive technology." *Id.* at Chapter 3: Ensure portal access for all patients.

In this document, the government further explicitly told healthcare providers to use their websites and social media (Facebook in particular) to promote their patient portals: "***Use Playbook language on your website or Facebook page to let patients know how they can use the patient portal to participate in their care.***" *Id.* at Introduction (emphasis added).

These are only a few examples of the many ways in which the Office of the National Coordinator told healthcare providers how to design their patient portal websites. And in doing so, the government further told these providers that "[t]his playbook is an important tool for *our mission* to help clinicians and their patients adopt and adapt to

38

patient portals and patient-generated health data. We hope you'll use it in a way that works for you and your practice." *Id.* (emphasis added).

*Third*, and following along similar lines, the court held that "BJC has not shown that it performed a basic task or duty of the federal government." *BJC Health*, 89 F.4th at 1046; *id.* at 1047 (holding that, "[i]n sum, the creation and operation of an online patient portal is not a basic governmental task").

Here again though, the Eighth Circuit did not analyze the factual record before this Court in making this holding. This factual record shows that making health information immediately available online to patients did become a basic governmental task. As the National Coordinator stated in the initial 2011-2015 Federal Health IT Strategic Plan: "The Federal Health IT Taskforce has recognized individual access to data as a primary objective." ROA.0740.

As set forth above, in this same section of the 2011-2015 Federal Health IT Strategic Plan titled "Goal IV: Empower Individuals with Health IT to Improve their Health and Health Care System", the National Coordinator noted that "only 7 percent of Americans have used a web site to access their health information online." ROA.0423. "Even

fewer have used mobile health (mHealth) applications and remote monitoring technologies." *Id.* "These low rates are the result of multiple dynamics: most consumers are not aware of nor able to afford the technologies, do not have access to their health information, or do not expect to take as active a role in their health and health care as they might in other aspects of their lives." *Id.* "As a result, they have not created a robust marketplace for technology innovation." (*Id.*)

The National Coordinator thus concluded: "*To truly empower consumers and move the health care system to become more patient-centered, the government will need help to change these dynamics.*" *Id.* And: "*Engaging individuals with health data is a top priority of the Medicare and Medicaid EHR Incentive Programs.*" *Id.* (emphasis added); *see also id.* ("The single biggest lever to individual empowerment is access to data").)

These statements are only representative of the record before this Court on this basic point as well. As the National Coordinator stated in the 2014 publication "*A 10-Year Vision to Achieve and Interoperable Health IT Infrastructure*": "The U.S. Department of Health and Human Services (HHS) has a critical responsibility to advance the connectivity

40

of electronic health information and interoperability of health
information technology (health IT). This is consistent with its mission to
protect the health of all Americans and provide essential human
services, especially for those who are least able to help themselves."
ROA.0812; *see also* ROA.0866 ("It is imperative for government to
address this new electronic health information and health IT paradigm
to improve the health of the nation."); ROA.1233 ("With this Plan, the
federal government demonstrates its ongoing coordinated focus on the
interoperability of EHI and the reduction of provider burden.").

In sum, the Eighth Circuit's opinion in *BJC Health* appears
detached from the claims and the factual record before this Court, or at
the least did not analyze how the claims and factual records at issue are
the same.

## E.    Plaintiffs' Claims Relate to Actions That The Healthcare Providers Took Under Federal Direction.

The Healthcare Providers satisfy the "for or relating to"
requirement as well because Plaintiffs assert claims relating to actions
that the Healthcare Providers took under the direction of the federal

government. 28 U.S.C. § 1442(a)(1).[2] As the Seventh Circuit recognized in *Baker*, the Supreme Court has "never utilized a rigid causation standard" on this element of removal. *Baker* at 944 (joining other courts of appeal in abandoning the "causal connection" test in favor of the more expansive connection rationale "that better comports with the Supreme Court's decisions").

This hurdle is quite low and "intended to broaden the universe of acts that enable" federal officer removal. *See In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 467 (3d Cir. 2015) (quoting the legislative record)). Put another way, it is sufficient for the Healthcare Providers to have shown that the activity derived from their relationship with the federal government. *See Baker* at 944. Any questions about whether the activity in question did in fact arise from the relationship are for the federal courts to decide. *Id.* ("If the question raised is whether they were engaged in some kind of 'frolic of their own' in relation to respondent,

---

[2] The district courts did not reach this element in any of the consolidated appeals.

then they should have the opportunity to present their version of the facts to a federal, not a state, court.").

To that end, the Supreme Court emphasized that "related to" is a term of breadth that requires courts to read "the relevant text expansively." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1760 (2018). In other words, there need only be a connection between the federally directed conduct and Plaintiffs' claims—*i.e.*, that "the challenged acts 'occurred because of what they were asked to do by the Government.' " *Goncalves*, 865 F.3d at 1245 (quoting *Isaacson,* 517 F.3d at 137); *see also Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020) (the challenged conduct must be "connected or associated with an act pursuant to a federal officer's direction"); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) ("[T]here need be only a connection or association between the act in question and the federal office." (citation and emphasis omitted)).

The required connection or association is on full display here. The National Coordinator directed the complained-of conduct. It said, "[j]ust making a portal available to patients will not ensure that they use it. The portal must be engaging and user-friendly, and must support

patient-centered outcomes." ROA.0792. In the National Coordinator's

Patient Engagement Playbook – which it described as "an important

tool for *our mission* to help clinicians and their patients adopt and

adapt to patient portals and patient-generated health data" – the

National Coordinator explicitly told health care providers to "[u]se

Playbook language ***on your website or Facebook page*** to let patients

know how they can use the patient portal to participate in their care."

Patient Engagement Playbook at Introduction (emphasis added))

The Playbook further directed health care providers to "[m]arket

and educate effectively," to "leverage every educational opportunity," to

"[t]ake advantage of every touchpoint," and to "[t]ake every opportunity

to promote patient portal enrollment." *Id.* at Chapter 1. The very

technological tools that form the basis of the alleged privacy violations

contained in Plaintiffs' complaints were promoted by the federal

government for patient portals.

The Healthcare Providers here are hardly alone in using tools like

the Meta Pixel to comply with the MUP requirements. Not only do

hospital systems around the country use similar technology (as

evidenced by the recent surge of lawsuits challenging these practices),

44

***the federal government does too***. Specifically, CMS uses the same source code on the Medicare benefits website to promote and measure use that was allegedly used by the Healthcare Providers.[3] Consequently, a state-court adjudication that the Healthcare Providers (and by implication, the federal government) are mishandling medical health information and invading patients' privacy is exactly the kind of state interference that federal officer removal is designed to protect against. The outcome of this case could chill nationwide meaningful-use efforts by both HHS and private healthcare providers across the United States.

For the causal connection prong, the question for the Court is clear: Would Plaintiffs have sued in the absence of the modern website created by the Healthcare Providers? The plain answer is no. This case falls squarely in the essential purpose of the federal officer removal statute—the protection of federal operations and programs from the interference of state-court litigation.

---

[3] *See* https://www.cms.gov/about-cms/web-policies-important-links/web-policies/privacy (describing types of information collected by CMS, including but not limited to, domains, IP addresses, pages visited, time spent on pages, and actions taken on CMS.gov like clicking on a button).

**F.    The Healthcare Providers Raise Colorable Federal Defenses.**

Finally, the Healthcare Providers have colorable federal defenses to Plaintiffs' claims.[4] The standard here, too, is low: "For a defense to be considered colorable, it need only be plausible; § 1442(a)(1) does not require a court to hold that a defense will be successful before removal is appropriate." *Graves*, 17 F.4th at 771 (quoting *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001)).

The Healthcare Providers assert two colorable federal defenses. First, they maintain federal defenses under HIPAA, and second, they maintain defenses based on preemption principles.

### 1.    *Defenses Under HIPAA*

When an alleged, and disputed, federal duty forms the basis for Plaintiffs' alleged state law claims, then removal under 28 U.S.C. § 1442(a)(1) is appropriate. *Jefferson Cty., Ala. v. Acker*, 527 U.S. 423, 431 (1999). Plaintiffs allege that under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a

---

[4] The district courts did not reach this element in any of the consolidated appeals.

patient for marketing purposes without the patients' express written authorization. ROA.0631-0632; ROA.0972-0973; ROA.1039-1040; ROA.1339. From there, Plaintiffs allege that "HHS has expressly stated that Defendant's conduct of implementing the Meta Pixel is a violation of HIPAA Rules." ROA.0050; ROA.0121; ROA.0233; ROA.0317; ROA.0638.

Federal law, as cited by Plaintiffs, defines the gambit of "Protected Health Information." *See* 45 C.F.R. § 160.103, *et seq*. The Healthcare Providers dispute that any protected health information was disclosed by using third-party source code on their publicly available websites. As the Ninth Circuit held in a case challenging similar alleged website privacy violations stemming from the use of the Facebook "Like" button: "The district court also properly rejected Plaintiffs' claims that the collected data is subject to more stringent disclosure requirements under [HIPAA] (codified as amended in scattered sections of 42 U.S.C.) and California Civil Code section 1798.91 (2014)." *Smith v. Facebook*, 745 F. App'x 8, 9 (9th Cir. 2018). The court concluded: "Information available on the **publicly accessible website** stands in stark contrast to the personally identifiable patient records and medical histories

47

protected by these statutes—information that unequivocally provides a window into an individual's personal medical history." *Id.* (emphasis added). "Put simply, the connection between a person's browsing history and his or her own state of health is too tenuous to support Plaintiffs' contention that the disclosure requirements of HIPAA or section 1798.91 apply." *Id.*

Right or wrong, this federal defense to Plaintiffs' state law claims provides the federal court with jurisdiction under 28 U.S.C. § 1442(a)(1). *See UPMC*, 2020 WL 4381675, at *6 ("Because UPMC denies violating its duties under HIPAA, UPMC raises a colorable federal defense.").

### 2. *Preemption Defenses*

The Healthcare Providers also have a colorable implied preemption defense under the principles laid out in *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347–48 (2001). In *Buckman*, the Plaintiff alleged that the Appellant made fraudulent representations to the Food and Drug Administration to obtain approval of a medical device. *Id.* at 341. The Supreme Court held that the Plaintiffs' state-law "fraud-on-the-FDA" claims were impliedly preempted by the Federal

48

Food, Drug, and Cosmetic Act because the claims "inevitably conflict[ed] with the FDA's responsibility to police fraud consistently with the Agency's judgment and objectives." *Id.* at 342. The Court explained that federal preemption is warranted where "the relationship between a federal agency and the entity it regulates is inherently federal in character." *Id.* at 347.

That is the case here. Plaintiffs' suit threatens the means by which the Healthcare Providerscomply with the MUP, and thus conflicts with the Healthcare Providers' relationships with HHS, CMS, and the National Coordinator. *See id.* at 348; *see also In re Commonwealth*, 790 F.3d at 474 (finding a colorable implied preemption defense where Plaintiff were "attempting to interfere in the relationship between" the Appellant and the federal agency). This conflict requires a federal forum to resolve.

## CONCLUSION

Jurisdiction is proper in federal court under 28 U.S.C. § 1442(a)(1) because the federal government needed healthcare providers to participate in the core federal mission to provide health information to patients online as part of a broader federal health information

technology initiative. The nationwide system of easily-accessible EHRs is something the federal government wanted to be created, then tasked Healthcare Providers with that mission. The Healthcare Providers heeded this federal command and are now being sued in state court for actions taken under color of federal law, in alleged violation of duties created by federal law. The Court should reverse the district courts' remand orders.

**TAFT STETTINIUS & HOLLISTER LLP**

*/s/ Peter S. French*
Matthew T. Albaugh
Peter S. French
Vivek R. Hadley
One Indiana Square, Suite 3500
Indianapolis, IN 46204
317.713.3500
malbaugh@taftlaw.com
pfrench@taftlaw.com
vhadley@taftlaw.com

**BAKER & HOSTETLER LLP**

*/s/ David A. Carney*
David A. Carney
127 Public Square, Suite 2000
Cleveland, OH 4114
216.621.0200
dcarney@bakerlaw.com

Paul G. Karlsgodt
1801 California Street, Suite 4400
Denver, CO 80202
303.861.0600
pkarlsgodt@bakerlaw.com

*Attorneys for the Consolidated Defendants-
Appellants*

**CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7),
FRAP RULE 32(g), and CR 32(c)**

The undersigned, counsel of record for the Consolidated

Defendants-Appellants, hereby certify that this brief conforms to the

type-volume, typeface and type-style requirements contained in Fed. R.

App. P. Rule 32(a)(7). The length of this brief is 9,114 words.

Dated: February 26, 2024

/s/ Peter S. French
Peter S. French

/s/ David A. Carney
David A. Carney

# CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2024, a copy of the foregoing Opening Brief was served by operation of the Court's electronic filing system which will provide notice to counsel for all parties. Fifteen printed copies of the Opening Brief will be mailed to the United States Court of Appeals for the Seventh Circuit, and one copy to the following counsel, via two-day service:

Lynn A. Toops
Emily Davin Kopp
Mary Kate Dugan
Vess Allen Miller
Amina Thomas
Cohen & Malad, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204

*Counsel for Plaintiffs-Appellees Brian Elkins and Annie Elkins, Kaitlin Lamarr, John Doe, Jennifer Fleece, Keith Chiaro and Jane Doe*

David I. Cates
Katie E. St. John
The Cates Law Firm
216 West Pointe Drive, Suite A
Swansea, IL 62226

*Counsel for Plaintiff-Appellee John Doe*

James Gerard Stranch, IV
Stranch, Jennings & Garvey, PLLC
223 Rosa L. Parks Avenue
Freedom Building, Suite 200
Nashville, TN 37203

*Counsel for Plaintiffs-Appellees Kaitlin Lamarr and Jennifer Fleece*

/s/ Peter S. French
Peter S. French

/s/ David A. Carney
David A. Carney

53

## CIRCUIT RULE 30 APPENDIX

| Title | Short Appendix | Full Appendix |
|---|---|---|
| Elkins Order on Remand | A-1 – A-8 | App. 0177 – 0184 |
| Lamarr Order on Remand | A-9 – A-16 | App. 0574 – 0581 |
| Sarah Bush Order on Remand | A-17 – A-32 | App. 0913 – 0928 |
| Fleece Order on Remand | A-33 – A-38 | App. 12798 – 1284 |
| Chiaro Order on Remand | A-39 – A-46 | App. 1654 – 1661 |

Pursuant to Circuit Rule 30(d), counsel hereby certifies that this appendix includes all the materials required by Circuit Rule 30(a) and (b).

Dated: February 26, 2024

/s/ *Peter S. French*
Peter S. French

/s/ *David A. Carney*
David A. Carney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BRIAN ELKINS Individually, and on behalf )
of all others similarly situated, )
ANNIE ELKINS Individually, and on )
behalf of all others similarly situated, )
)
Plaintiffs, )
)
v. )      No. 1:23-cv-01117-JRS-TAB
)
SOUTHEASTERN INDIANA HEALTH )
MANAGEMENT INC. D/B/A COLUMBUS )
REGIONAL HEALTH, )
)
Defendant. )

**Order on Motion to Remand**

## I.    Introduction

This is a data privacy case.  Brian Elkins (alongside Annie Elkins and a putative

class) alleges that a website-tracking "pixel" embedded in a hospital's patient portal

shared his health data without his consent.  The hospital, Columbus Regional Health,

removed the case from state court under 28 U.S.C. § 1442(a)(1), the federal officer

removal statute, and 28 U.S.C. § 1331, the federal question statute.  Now before the

Court is Elkins' Motion to Remand. (ECF No. 17.)

## II.    Discussion

### A.  Federal Officer

Under 28 U.S.C. § 1442(a), federal officers and their deputies may remove state

lawsuits to federal court to vindicate a federal defense.  "[R]emoval is appropriate

when 'the defendant (1) is a person within the meaning of the statute, (2) is acting

**A-1**

under the United States, its agencies, or its officers, (3) is acting under color of federal authority, and (4) has a colorable federal defense.'" *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 941 (7th Cir. 2020) (quoting *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018)).

Historically, federal officer removal was intended "to protect the Federal Government from the interference with its operations that would ensue were a State able, for example, to arrest and bring to trial in a State court for an alleged offense against the law of the State, officers and agents of the Federal Government acting within the scope of their authority." *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 150 (2007) (quoting *Willingham v. Morgan*, 395 U.S. 402, 406 (1969)) (cleaned up).  And that purpose applies equally to federal officers' assistants or deputies. *Id.* at 151.  So, for example, a private individual driving prohibition agents to a distillery raid is "acting under" the agents, *id.* at 150 (citing *Maryland v. Soper (No. 1)*, 270 U.S. 9, 46 (1926)), and an army corporal is "acting under" a revenue agent when he helps the agent besiege a distiller's moonshine operation, *id.* at 149 (citing *Davis v. South Carolina*, 107 U.S. 597, 600 (1883)).

Here, Columbus Regional asserts that it "act[ed] under" a subdivision of the U.S. Department of Health and Human Services by creating an online patient portal that satisfied the criteria for Medicare incentive payments.  That is not the direct deputy relationship that historically allowed for federal officer removal.  If one asks, "is a private hospital effectively a government agent when it makes a website to earn incentive payments?" the *prima facie* answer is "absolutely not."  Other district courts

to have considered the issue reach the same conclusion.  *See Martin v. LCMC Health Holdings, Inc.*, No. CV 23-411, 2023 WL 4540547, at *4 (E.D. La. July 5, 2023) (discussing emerging consensus view that federal officer removal is not appropriate, independently analyzing issue, and concluding that allowing federal officer removal on these facts "is inconsistent with the constitutional role of the federal courts.").  But there is conflicting authority to complicate the issue in the Seventh Circuit.

The Supreme Court in *Watson* held that mere compliance with federal law and regulation is not "acting under" a federal official.  *Id.* at 153.  In dicta, though, the Court went on to say that a private contractor might be "acting under" the federal government when it "is helping the Government to produce an item that it needs." *Id.*  The Court approved the Fifth Circuit's holding in *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998), that a manufacturer producing Agent Orange for the government, according to government specifications and under threat of criminal sanctions, was "acting under" the government for federal officer removal purposes.  *Watson*, 551 U.S. at 153–54.

The Seventh Circuit picked up the Supreme Court's suggestion that private contractors might sometimes be "acting under" the federal government.  In *Ruppel v. CBS Corp.*, the court held that a manufacturer was "acting under" the federal government when it produced turbines for an aircraft carrier according to government specifications.  701 F.3d 1176, 1181 (7th Cir. 2012).  The court found that "CBS worked hand-in-hand with the government, assisting the federal government in building warships," and noted that "'[a]cting under' covers situations, like this one,

where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Id.*  In *Betzner*, the court quoted that conclusion from *Ruppel* and held that a manufacturer was "acting under" federal officers when it "contracted to manufacture heavy bomber aircraft for the United States Air Force." *Betzner,* 910 F.3d at 1015.  And in *Baker*, the court held that a wartime manufacturer of raw materials for the government was "acting under" federal authority. *Baker*, 962 F.3d at 942.  The court justified the line of military-contractor cases by returning to *Watson*'s dicta: "where a private contractor helps 'the Government to produce an item that it needs[,] [t]he assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks.'" *Id.* (quoting *Watson*, 551 U.S. at 153).

At least in some cases, then—in particular, those where a wartime manufacturer is making goods under contract for the U.S. government—"private contractors performing tasks for the government are sometimes covered under section 1442." *Panther Brands, LLC v. Indy Racing League, LLC*, 827 F.3d 586, 590 (7th Cir. 2016). But it is possible to "take this idea too far." *Id.*  Only those contractor relationships that are "closely monitored and highly regulated" satisfy the "acting under" requirement. *Id.*  Recall that *Watson*, dicta aside, holds that though a "federal regulatory agency directs, supervises, and monitors a company's activities in considerable detail," that relationship does not mean the company "acts under" the agency. *Watson*, 551 U.S. at 145.  The Seventh Circuit holds that a nursing home

seeking Medicare reimbursement falls into the highly-regulated-but-not-acting-under category. *Martin v. Petersen Health Operations*, *LLC*, 37 F.4th 1210, 1213 (7th Cir. 2022) (citing *Blum v. Yaretsky*, 457 U.S. 991 (1982)).

Columbus Regional Health is more like the nursing home in *Martin* than like the wartime contractors in *Ruppel*, *Betzner*, and *Baker*. Its patient portal is not something the government "needs," *Baker*, 962 F.3d at 942 (quoting *Watson*, 551 U.S. at 153), nor is the maintenance of electronic health records a "basic governmental task," *id*. Columbus Regional is exactly what it looks like: a private hospital. And "[p]rivate firms retain their private character even when many aspects of their conduct are controlled by federal statutes and rules." *Martin*, 37 F.4th at 1213.

Because Columbus Regional is not "acting under" the Department of Health and Human Services by maintaining its patient portal, federal officer removal is not appropriate under 28 U.S.C. § 1442(a)(1). The Court need not address the other elements of the statutory test.

### B. Federal Question

Elkins advances only state-law theories in his Complaint, (ECF No. 1-2), so, under the usual well-pleaded complaint rule, there is no federal question jurisdiction under 28 U.S.C. § 1331. *Gunn v. Minton*, 568 U.S. 251, 257 (2013). Columbus Regional argues that this case fits into the *Grable* exception to that rule, which admits of federal-question jurisdiction where a federal issue will control an otherwise state-law claim. Under that exception, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4)

capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.* at 258 (citing *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)).

Columbus Regional argues that there is a "federal issue" at stake here because Elkins might use HIPAA violations to prove liability under his state-law theories. That issue does not fit through *Grable*'s narrow door. The Supreme Court has already rejected the idea that a federal regulatory scheme, itself lacking a private right of action, can provide federal-question jurisdiction when a state-law case uses the regulatory standards as evidence of liability. *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 817 (1986). And even if it had not, the HIPAA question is not "necessarily raised" by any one of Elkins' state law theories, much less all of them. A jury could, for instance, find that the tracking pixel breached an implied contract of data privacy without regard to the standards of patient health data as defined in HIPAA.

The lack of a single *Grable* element is dispositive; 28 U.S.C. § 1331 jurisdiction is not warranted here.

### C. Attorney Fees

While the Court has the power to award Elkins attorney fees under 28 U.S.C. § 1447(c) for prevailing on his motion to remand, such an award is only appropriate where "clearly established law" demonstrates there was no basis for removal. *Lott v. Pfizer, Inc.*, 492 F.3d 789, 793 (7th Cir. 2007). The Court thinks Columbus Regional's federal officer argument, while not successful, was at least colorable in light of the

Seventh Circuit's military-contractor cases, and so the Court declines to award attorney fees.

## III.   Conclusion

Columbus Regional Health was not "acting under" the federal government for the purposes of 28 U.S.C. § 1442(a)(1) federal officer removal, nor does this case raise a federal issue that permits of 28 U.S.C. § 1331 jurisdiction.  Elkins' Motion to Remand, (ECF No. 16), is **granted**, except as to attorney fees, and the Court **remands** the case to Marion County Superior Court.

The clerk is directed to **close** the federal case.

**SO ORDERED.**

Date: 10/10/2023

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Matthew Thomas Albaugh
Taft Stettinius & Hollister LLP
malbaugh@taftlaw.com

Mary Kate Dugan
Cohen & Malad, LLP
mdugan@cohenandmalad.com

Peter S. French
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
pfrench@taftlaw.com

Vivek Randle Hadley
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
vhadley@taftlaw.com

Emily Davin Kopp
Cohen & Malad, LLP
ekopp@cohenandmalad.com

Lynn A. Toops
COHEN & MALAD LLP
ltoops@cohenandmalad.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KAITLIN LAMARR Individually, and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:23-cv-01173-JRS-MJD |
| GOSHEN HEALTH SYSTEM, INC. d/b/a GOSHEN HEALTH, | ) ) ) | |
| Defendant. | ) | |

**Order on Motion to Remand**

### I.    Introduction

This is a data privacy case.  Kaitlin Lamarr (for a putative class) alleges that a website-tracking "pixel" embedded in a hospital's patient portal shared her health data without her consent.  The case is substantively identical to *Elkins v. Southeastern Indiana Health Management Inc.*, 1:23-cv-01117-JRS-TAB, also pending before this Court.  Just as in the earlier-filed case, the hospital defendant, Goshen Health in the instant case, removed the case from state court under 28 U.S.C. § 1442(a)(1), the federal officer removal statute, and 28 U.S.C. § 1331, the federal question statute.  Now before the Court is Lamarr's Motion to Remand, (ECF No. 14), and Goshen's Motion to Dismiss, (ECF No. 25).  The Court's discussion of the issues follows its disposition of *Elkins*.

## II.    Discussion

### A.  Federal Officer

Under 28 U.S.C. § 1442(a), federal officers and their deputies may remove state lawsuits to federal court to vindicate a federal defense.  "[R]emoval is appropriate when 'the defendant (1) is a person within the meaning of the statute, (2) is acting under the United States, its agencies, or its officers, (3) is acting under color of federal authority, and (4) has a colorable federal defense.'"  *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 941 (7th Cir. 2020) (quoting *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018)).

Historically, federal officer removal was intended "to protect the Federal Government from the interference with its operations that would ensue were a State able, for example, to arrest and bring to trial in a State court for an alleged offense against the law of the State, officers and agents of the Federal Government acting within the scope of their authority."  *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 150 (2007) (quoting *Willingham v. Morgan*, 395 U.S. 402, 406 (1969)) (cleaned up).  And that purpose applies equally to federal officers' assistants or deputies.  *Id.* at 151.  So, for example, a private individual driving prohibition agents to a distillery raid is "acting under" the agents, *id.* at 150 (citing *Maryland v. Soper (No. 1)*, 270 U.S. 9, 46 (1926)), and an army corporal is "acting under" a revenue agent when he helps the agent besiege a distiller's moonshine operation, *id.* at 149 (citing *Davis v. South Carolina*, 107 U.S. 597, 600 (1883)).

APP.0575

Here, Goshen asserts that it "act[ed] under" a subdivision of the U.S. Department of Health and Human Services by creating an online patient portal that satisfied the criteria for Medicare incentive payments.  That is not the direct deputy relationship that historically allowed for federal officer removal.  If one asks, "is a private hospital effectively a government agent when it makes a website to earn incentive payments?" the *prima facie* answer is "absolutely not."  Other district courts to have considered the issue reach the same conclusion.  *See Martin v. LCMC Health Holdings, Inc.*, No. CV 23-411, 2023 WL 4540547, at *4 (E.D. La. July 5, 2023) (discussing emerging consensus view that federal officer removal is not appropriate, independently analyzing issue, and concluding that allowing federal officer removal on these facts "is inconsistent with the constitutional role of the federal courts.").  But there is conflicting authority to complicate the issue in the Seventh Circuit.

The Supreme Court in *Watson* held that mere compliance with federal law and regulation is not "acting under" a federal official.  *Id.* at 153.  In dicta, though, the Court went on to say that a private contractor might be "acting under" the federal government when it "is helping the Government to produce an item that it needs." *Id.*  The Court approved the Fifth Circuit's holding in *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998), that a manufacturer producing Agent Orange for the government, according to government specifications and under threat of criminal sanctions, was "acting under" the government for federal officer removal purposes.  *Watson*, 551 U.S. at 153–54.

The Seventh Circuit picked up the Supreme Court's suggestion that private contractors might sometimes be "acting under" the federal government. In *Ruppel v. CBS Corp.*, the court held that a manufacturer was "acting under" the federal government when it produced turbines for an aircraft carrier according to government specifications. 701 F.3d 1176, 1181 (7th Cir. 2012). The court found that "CBS worked hand-in-hand with the government, assisting the federal government in building warships," and noted that "'[a]cting under' covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Id.* In *Betzner*, the court quoted that conclusion from *Ruppel* and held that a manufacturer was "acting under" federal officers when it "contracted to manufacture heavy bomber aircraft for the United States Air Force." *Betzner,* 910 F.3d at 1015. And in *Baker*, the court held that a wartime manufacturer of raw materials for the government was "acting under" federal authority. *Baker*, 962 F.3d at 942. The court justified the line of military-contractor cases by returning to *Watson*'s dicta: "where a private contractor helps 'the Government to produce an item that it needs[,] [t]he assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks.'" *Id.* (quoting *Watson*, 551 U.S. at 153).

At least in some cases, then—in particular, those where a wartime manufacturer is making goods under contract for the U.S. government—"private contractors performing tasks for the government are sometimes covered under section 1442."

*Panther Brands, LLC v. Indy Racing League, LLC*, 827 F.3d 586, 590 (7th Cir. 2016).
But it is possible to "take this idea too far." *Id.* Only those contractor relationships
that are "closely monitored and highly regulated" satisfy the "acting under"
requirement. *Id.* Recall that *Watson*, dicta aside, holds that though a "federal
regulatory agency directs, supervises, and monitors a company's activities in
considerable detail," that relationship does not mean the company "acts under" the
agency. *Watson*, 551 U.S. at 145. The Seventh Circuit holds that a nursing home
seeking Medicare reimbursement falls into the highly-regulated-but-not-acting-
under category. *Martin v. Petersen Health Operations, LLC*, 37 F.4th 1210, 1213 (7th
Cir. 2022) (citing *Blum v. Yaretsky*, 457 U.S. 991 (1982)).

Goshen is more like the nursing home in *Martin* than like the wartime contractors
in *Ruppel*, *Betzner*, and *Baker*. Its patient portal is not something the government
"needs," *Baker*, 962 F.3d at 942 (quoting *Watson*, 551 U.S. at 153), nor is the
maintenance of electronic health records a "basic governmental task," *id.* Goshen
Health is exactly what it looks like: a private hospital. And "[p]rivate firms retain
their private character even when many aspects of their conduct are controlled by
federal statutes and rules." *Martin*, 37 F.4th at 1213.

Because Goshen is not "acting under" the Department of Health and Human
Services by maintaining its patient portal, federal officer removal is not appropriate
under 28 U.S.C. § 1442(a)(1). The Court need not address the other elements of the
statutory test.

### B.  Federal Question

Lamarr advances only state-law theories in her Complaint, (ECF No. 1-2),[1] so, under the usual well-pleaded complaint rule, there is no federal question jurisdiction under 28 U.S.C. § 1331.  *Gunn v. Minton*, 568 U.S. 251, 257 (2013).  Goshen argues that this case fits into the *Grable* exception to that rule, which admits of federal-question jurisdiction where a federal issue will control an otherwise state-law claim. Under that exception, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  *Id.* at 258 (citing *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)).

Goshen argues that there is a "federal issue" at stake here because Lamarr might use HIPAA violations to prove liability under her state-law theories.  That issue does not fit through *Grable*'s narrow door.  The Supreme Court has already rejected the idea that a federal regulatory scheme, itself lacking a private right of action, can provide federal-question jurisdiction when a state-law case uses the regulatory standards as evidence of liability.  *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S.

---

[1] Lamarr has filed an "Amended Complaint," (ECF No. 23), in this Court while her own motion to remand was pending.  The Court, comparing the two pleadings—a task made more difficult by the Complaints' incredible (and unnecessary) prolixity, *see* Fed. R. Civ. P. 8(a)(1) (calling for a "short and plain" statement); Ind. R. Tr. P. 8(a)(1) (same), and by Goshen's decision to submit a crooked scanned copy of the removed Complaint instead of a clean electronic version—can find no substantive changes.  The Amended Complaint is, in any case, irrelevant, because the Court in evaluating remand considers the Complaint operative at the time of removal.  *Pullman Co. v. Jenkins*, 305 U.S. 534, 537–38 (1939); *United Farm Bureau Mut. Ins. Co. v. Metro. Hum. Rels. Comm'n*, 24 F.3d 1008, 1014 (7th Cir. 1994) (citing *Pullman*).

804, 817 (1986).  And even if it had not, the HIPAA question is not "necessarily raised" by any one of Lamarr's state law theories, much less all of them.  A jury could, for instance, find that the tracking pixel breached an implied contract of data privacy without regard to the standards of patient health data as defined in HIPAA.

The lack of a single *Grable* element is dispositive; 28 U.S.C. § 1331 jurisdiction is not warranted here.

### C. Attorney Fees

While the Court has the power to award Lamarr attorney fees under 28 U.S.C. § 1447(c) for prevailing on her motion to remand, such an award is only appropriate where "clearly established law" demonstrates there was no basis for removal.  *Lott v. Pfizer, Inc.*, 492 F.3d 789, 793 (7th Cir. 2007).  The Court thinks Goshen's federal officer argument, while not successful, was at least colorable in light of the Seventh Circuit's military-contractor cases, and so the Court declines to award attorney fees.

### III.    Conclusion

Lamarr's Motion to Remand, (ECF No. 14), is **granted,** except as to attorney fees, and this case is **remanded** to Marion County Superior Court.  This Court relinquishes jurisdiction, and so Goshen's Motion to Dismiss, (ECF No. 25) is **denied, without prejudice** to the conduct of proceedings in the state court.

The clerk is directed to **close** the federal case.

**SO ORDERED.**

Date: 10/12/2023

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Arend J. Abel
COHEN & MALAD LLP
aabel@cohenandmalad.com

Mary Kate Dugan
Cohen & Malad, LLP
mdugan@cohenandmalad.com

Michelle R. Gomez
Baker & Hostetler LLP
mgomez@bakerlaw.com

Paul G Karlsgodt
Baker & Hostetler LLP
pkarlsgodt@bakerlaw.com

Emily Davin Kopp
Cohen & Malad, LLP
ekopp@cohenandmalad.com

Tyler John Moorhead
BOSE MCKINNEY & EVANS LLP
tmoorhead@boselaw.com

Amina Thomas
COHEN & MALAD LLP
athomas@cohenandmalad.com

Lynn A. Toops
COHEN & MALAD LLP
ltoops@cohenandmalad.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
pzimmerly@boselaw.com

APP.0581

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| JOHN DOE, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Case No. 23-CV-2170 |
| SARAH BUSH LINCOLN HEALTH CENTER, | ) ) ) ) | |
| Defendant. | ) ) | |

### <u>ORDER</u>

Plaintiff, John Doe, on behalf of himself and all others similarly situated, filed a Class Action Complaint in the Circuit Court of Coles County, Illinois, on June 27, 2023. On August 7, 2023, Defendant, Sarah Bush Lincoln Health Center, filed a Notice of Removal (#1) to this court, citing as the basis for removal federal officer removal pursuant to 28 U.S.C. § 1442(a)(1). On September 6, 2023, Plaintiff filed a Motion to Remand (#9). Defendant filed a Response (#12) on October 4, 2023, to which Plaintiff filed a Reply (#14) on October 18, 2023. For the following reasons, Plaintiff's Motion to Remand (#9) is GRANTED and this case is remanded to state court.

### BACKGROUND

The background in this case, up to Defendant's removal of this action to federal court, is taken from Plaintiff's state court Complaint, attached to the Notice of Removal, and the attachments to Defendant's Response to Plaintiff's Motion to Remand. Because the parties do not contest the accuracy of the factual assertions in each other's filings,

but only the legal sufficiency thereof for removal purposes, the court will accept the factual assertions as true for the purposes of this Order. See *Schumacher v. Sterigenics U.S., LLC,* 394 F.Supp.3d 837, 839-40 (N.D. Ill. 2019).

*Plaintiff's Complaint*

Defendant is a private, nonprofit hospital and regional healthcare network based in Coles County, Illinois. It is a general hospital and surgery center that provides inpatient, outpatient, and emergency room services to the region's patients, including Medicare and Medicaid recipients. It serves many of its patients via its online platforms, which it encourages patients to use to find healthcare services and providers, access information about specific health conditions, sign up for classes and events, access its billing and patient record portals, and more.

To increase the success of its advertising and marketing sales, Defendant purposefully installed the Meta[1] Pixel and trackers onto its website and online platforms. In doing so, Defendant shared patients' private and protected communications, including those containing Plaintiff's private information, with Facebook and other third parties. Meta Pixel is a tool that tracks people and type of actions they take. When a user accesses a web page that is hosting the Meta Pixel, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook, traveling from the user's browser to Facebook's

---

[1]Meta is the social media corporation and platform formerly known as "Facebook." The two names may be used interchangeably throughout this Order.

A-18                                                              APP.0914

server.  Meta Pixel's primary purposes are marketing, ad targeting, and sales generation.  Defendant employed Meta Pixel to intercept, duplicate, and redirect Plaintiff's private information to Facebook contemporaneously, invisibly, and without his knowledge.

Plaintiff has been a patient of Defendant for at least 15 years.  He received healthcare services from Defendant and physicians in Defendant's network, and he relied on Defendant's online platforms to communicate confidential patient information.  He last used Defendant's website in early 2022, when he used it to search for a doctor to treat his back pain.  After Plaintiff used the online platforms, advertisements for back surgery began appearing in his Facebook feed.  Plaintiff would use the online platforms about two times a month, and would use them to find doctors and treatment facilities.  By use of Meta Pixel and tracking technology, Defendant sent Plaintiff's private information to Facebook and possibly others when he used Defendant's online platforms to communicate healthcare and identifying information to Defendant.

Plaintiff's Complaint contains seven Illinois state counts: (1) negligence; (2) negligence per se; (3) invasion of privacy; (4) breach of implied contract; (5) unjust enrichment; (6) breach of fiduciary duty; and (7) violation of the Illinois Consumer Fraud and Deceptive Practices Act (815 Ill. Comp. Stat. 505/1, et seq.).

*Defendant's Facts in Support of Federal Officer Removal Jurisdiction*

In 2011 the federal government identified as a problem the fact that only seven percent of Americans had a website to access their health information online.  To that end, the Office of the National Coordinator for Health Information Technology's

3

**A-19**

APP.0915

strategic plan concluded that "the government will need help to change these dynamics." The U.S. Department of Health and Human Services then published a rule for the Electronic Health Record ("EHR") Incentive Program via which the federal government would pay healthcare providers to provide electronic access to patient healthcare information online though part of a broader federal health information technology initiative called the Meaningful Use Program. The rule stated that "Certified EHR technology used in a meaningful way is one piece of a broader HIT [health information technology] infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety."

One important piece of the Meaningful Use Program's requirements became the ability for patients to access their healthcare records online. See 42 C.F.R. § 495.20(f)(12)(i)(B). The regulations required healthcare providers to report to the Office of the National Coordinator on their progress with respect to online access to healthcare records. To meet this criteria, the government encouraged healthcare providers to make online patient portals available to their patients, advising them, in a document entitled "How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use" issued by the "National Learning Consortium" from the Office of the National Coordinator, to "integrate a patient portal effectively into your practice operations." The government recommended healthcare providers: (1) learn the benefits of patient portals for patients and providers; (2) understand how a patient portal helps achieve Meaningful Use requirements; (3) implement proactive, engaging portal features; (4) implement the portal with a systemic process; and (5) actively promote and facilitate portal use.

4

**A-20**                                                          APP.0916

Defendant made an online patient portal available to its patients in 2013.  Per the declaration of Brian Murphy, Defendant's vice president of information systems, Defendant selected and made the patient portal available online in direct response to the federal government's Meaningful Use Program.

ANALYSIS

Plaintiff argues that this case should be remanded back to state court because "there is simply no federal hook to bring this case within this court's subject matter jurisdiction."  Plaintiff argues that Defendant has aggrandized its role in a federal incentives program "to create the illusion of federal officer status," as it has made no factual showing that it assisted or helped to carry out the tasks or duties of a federal superior.  Plaintiff argues Defendant was not hired or enlisted by the federal government to perform a particular function, and its actions were not taken pursuant to any federal program.  Plaintiff further argues that Defendant raises no colorable federal defense.  Plaintiff seeks fees incurred from the removal pursuant to 28 U.S.C. § 1447(c).

Defendant responds that it meets all the requirements of the statute to qualify for federal officer status.  Defendant argues that it was a person under the statute, and that it acted under color of federal law in creating the patient portal and making it available to its patients and their caretakers.  Defendant cites the goal of the federal government to have healthcare providers make health information immediately available to patients online, and how, to accomplish this goal, "Congress earmarked billions of dollars for healthcare providers who participated in the Meaningful Use Program through the federal Medicare and Medicaid programs."  Defendant assisted in this effort by making the patient portal available to its patients online.  In exchange for doing so, Defendant

5

**A-21**                                                          APP.0917

received payments directly from the federal government for providing this online

access, and now avoids federal financial penalties.  Defendant also made annual reports

to the federal government regarding the portal.  Defendant argues that it now faces

state law liability for action it took under color of federal law.  It was not merely

complying with federal law in creating the patient portal, it was assisting the federal

government in a basic federal governmental task.  Defendant argues that it has

colorable federal defenses to Plaintiff's state law claims, based on the Health Insurance

Portability and Accountability Act of 1996 ("HIPAA") and the First Amendment.

*Federal Officer Removal*

Defendant has removed this case to federal court pursuant to "federal officer

removal" under 28 U.S.C. § 1442(a)(1), "which permits the removal of cases in which a

federal agency or officer, or 'any person acting under that officer', is a defendant."

*Martin v. Petersen Health Operations, LLC*, 37 F.4th 1210, 1212 (7th Cir. 2022).  "Federal

officer removal is appropriate when 'the defendant (1) is a person within the meaning

of the statute, (2) is acting under the United States, its agencies, or its officers, (3) is

acting under color of federal authority, and (4) has a colorable federal defense.'" *Baker v.*

*Atlantic Richfield Co.*, 962 F.3d 937, 941 (7th Cir. 2020), quoting *Betzner v. Boeing Co.*, 910

F.3d 1010, 1015 (7th Cir. 2018).  A party seeking removal must satisfy all four

requirements of § 1442(a)(1) to remove the case to federal court.  *Totten v. Crane Co.*,

2014 WL 1689689, at *3 (N.D. Ill. Apr. 28, 2014).  The party seeking removal bears the

burden of establishing federal jurisdiction, and the U.S. Supreme Court "has made clear

that courts must liberally construe § 1442(a)."  *Betzner*, 910 F.3d at 1014.

6

**A-22**

1.    Whether Defendant is a Person Within the Meaning of § 1442(a)(1)

The parties do not dispute that Defendant is a "person" within the meaning of the statute, and therefore Defendant has satisfied this first requirement.

2.    Whether Defendant is Acting Under the Federal Government, its Agencies, or its Officers

"'The relevant relationship,' the Supreme Court has reminded us, 'is that of a private person acting under a federal officer or agency.'" *Baker*, 962 F.3d at 942, quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 151 (2007) (cleaned up).  Typically, that relationship involves subjection, guidance, or control, and the private person's "acting under" must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.  *Baker*, 962 F.3d at 942, citing *Watson*, 551 U.S. at 151–52.  "But 'the help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law.'" *Baker*, 962 F.3d at 942, quoting *Watson*, 551 U.S. at 152 (emphasis in *Watson*).

The central U.S. Supreme Court decision on this issue is *Watson*, which was discussed at length by the Seventh Circuit in *Baker*.  "In *Watson*, the Supreme Court explained that 'a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. A private firm's compliance (or non-compliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase "acting under" a federal "official." And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.'" *Baker*, 962 F.3d at 942, quoting *Watson*, 551 U.S. at 153.  Private actors have been found to be "acting under" the government where the private actor "helps 'the Government to produce an item that it needs[,]'" because then "'[t]he assistance that

7

**A-23**

private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks.'" *Baker*, 962 F.3d at 942, quoting *Watson*, 551 U.S. at 153.  In *Watson*, the Supreme Court cited with approval a case where the court found that "the private firm had 'fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war[,]'"and thus "the company 'performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform.'" *Baker*, 962 F.3d at 942, quoting *Watson*, 551 U.S. at 153-54.

In *Baker* itself, the Seventh Circuit concluded that the private actor defendant worked "hand-in-hand with the federal government to achieve a task that furthers an end of the federal government[,]" as the "government's detailed specifications for the makeup of ISR's materials, 'the compulsion to provide the product to the government's specifications,' and the continuous federal supervision all reveal the necessary relationship between ISR and the government[,]" and, accordingly, the private actor defendant "acted under federal authority." *Baker*, 962 F.3d at 942-43, quoting *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 400 (5th Cir. 1998).

In this case, Defendant claims to have been acting under the government in creating the patient portal, assisting the government in pursuit of its goal to have healthcare providers make health information immediately available to patients online. A number of district courts have already considered whether a private actor may remove an action to federal court on this basis pursuant to federal officer removal under 28 U.S.C. § 1442(a)(1).  Both parties acknowledge that the first two courts to consider the issue under the same basic facts as this case found that federal officer

8

removal was appropriate.  See Plaintiff's Memorandum in Support of Motion to
Remand (#10), at p. 12 n.1, and Defendant's Response (#12), at p. 12, citing *Doe v.
UPMC*, 2020 WL 4381675 (W.D. Pa. July 31, 2020), and *Doe v. ProMedica Health System,
Inc.*, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020).  However, both parties also
acknowledge that, since that time, "the tide has turned decidedly in the other
direction," and most cases have now concluded that there is no basis for federal officer
removal under these facts.  See Defendant's Response (#12), at p. 12, and Plaintiff's
Memorandum in Support of Motion to Remand (#10), at p. 11, citing *Doe v. BJC Health
System*, 2023 WL 369427 (E.D. Mo. Jan. 10, 2023); *Heard v. Torrance Memorial Medical
Center*, 2023 WL 2475544 (C.D. Cal. Mar. 13, 2023); *Doe v. Torrance Memorial Medical
Center*, 2023 WL 2916548 (C.D. Cal. Apr. 12, 2023); *Quinto v. Regents of the University of
California* 2023 WL 1448050 (N.D. Cal. Feb. 1, 2023); *Mohr v. Trustees of the University of
Pennsylvania*, 2023 WL 3044594 (E.D. Pa. Apr. 20, 2023); *Browne v. Cedars-Sinai Health
System*, 2023 WL 3095551 (C.D. Cal. Apr. 26, 2023); *Doe v. Hoag Memorial Presbyterian
Hospital*, 2023 WL 3197716 (C.D. Cal. May 2, 2023); *Martin v. LCMC Health Holdings, Inc.*,
2023 WL 4540547 (E.D. La. July 5, 2023); *Progin v. UMass Memorial Hospital*, 2023 WL
4535129 (D. Mass. July 13, 2023); *Doe v. SSM Health Care Corp.*, 2023 WL 5662099 (E.D.
Mo. Aug. 22, 2023); and *Doe v. Mosaic Health System*, 2023 WL 5125078 (W.D. Mo. July
20, 2023).

The court acknowledges that, in determining a matter of law, the fact that a
majority of courts to consider an issue has decided it one way does not bind this court
to follow those decisions.  Absent a binding decision from the U.S. Supreme Court or
the Seventh Circuit, this court must make its own determination based on its

interpretation of the applicable law.  However, having reviewed the various district court decisions to consider this issue, the court finds the majority line of cases to be better reasoned and more persuasive.

The court finds instructive a recent decision from a court in this circuit addressing a case with facts nearly identical to those present here.  In *Lamarr v. Goshen Health System, Inc.*, 2023 WL 6690582 (S.D. Ind. Oct. 12, 2023), the plaintiff alleged that a website-tracking "pixel" embedded in the defendant hospital's patient portal shared her health data without her consent.  The defendant removed the case to federal court under the federal officer removal statute, arguing that "it 'act[ed] under' a subdivision of the U.S. Department of Health and Human Services by creating an online patient portal that satisfied the criteria for Medicare incentive payments."  *Lamarr*, 2023 WL 6690582, at *1.

The district court began its analysis by noting that *Watson* held that "mere compliance with federal law and regulation is not 'acting under' a federal official[,]" and "that a private contractor might be 'acting under' the federal government when it 'is helping the Government to produce an item that it needs.'"  *Lamarr*, 2023 WL 6690582, at *2, quoting *Watson*, 551 U.S. at 153.  The court then discussed the relevant Seventh Circuit cases, where the court of appeals found private actors were "acting under" federal officers when they: produced turbines for an aircraft carrier according to government specifications (*Ruppel v. CBS Corp.*, 701 F.3d 1176 (7th Cir. 2012)); contracted to manufacture heavy bomber aircraft for the United States Air Force (*Betzner*); and were a wartime manufacturer of raw materials for the federal government (*Baker*).  *Lamarr*, 2023 WL 6690582, at *2.

Thus, the *Lamarr* court concluded, "[a]t least in some cases, then—in particular, those where a wartime manufacturer is making goods under contract for the U.S. government—'private contractors performing tasks for the government are sometimes covered under section 1442.'" *Lamarr*, 2023 WL 6690582, at *2, quoting *Panther Brands, LLC v. Indy Racing League, LLC*, 827 F.3d 586, 590 (7th Cir. 2016). But, the court found, "it is possible to 'take this idea too far[,]'" as "[o]nly those contractor relationships that are 'closely monitored and highly regulated' satisfy the 'acting under' requirement." *Lamarr*, 2023 WL 6690582, at *2, quoting *Panther Brands*, 827 F.3d at 590. The court cited to *Watson*'s dicta "that though a 'federal regulatory agency directs, supervises, and monitors a company's activities in considerable detail,' that relationship does not mean the company 'acts under' the agency." *Lamarr*, 2023 WL 6690582, at *2, quoting *Watson*, 551 U.S. at 145. The court then cited to *Martin*, where the Seventh Circuit held that a nursing home seeking Medicare reimbursement fell "into the highly-regulated-but-not-acting-under category." *Lamarr*, 2023 WL 6690582, at *2.

The court concluded that the defendant hospital was "more like the nursing home in *Martin* than like the wartime contractors in *Ruppel*, *Betzner*, and *Baker*[,]" because its patient portal is not something the government "needs,"nor is the maintenance of electronic health records a "basic governmental task." *Lamarr*, 2023 WL 6690582, at *2. Rather, the defendant was "exactly what it looks like: a private hospital[,] [a]nd '[p]rivate firms retain their private character even when many aspects of their conduct are controlled by federal statutes and rules.'" *Lamarr*, 2023 WL 6690582, at *2, quoting *Martin*, 37 F.4th at 1213. Because the defendant was not "acting under"

11

A-27                                                    APP.0923

the Department of Health and Human Services by maintaining its patient portal, the

court held that federal officer removal was not appropriate under 28 U.S.C. § 1442(a)(1).

*Lamarr*, 2023 WL 6690582, at *3.

Turning to the instant case, Defendant does not produce a product that the

government needs, nor is it otherwise fulfilling a basic governmental task.  See *Progin*,

2023 WL 4535129, at *4.  Although the Office of the National Coordinator "has an

obligation to 'develop, maintain, and direct the implementation of a strategic plan to

guide the nationwide implementation of interoperable health information technology,'

participation in the Meaningful Use Program serves broad federal goals, not basic

government functions[.]"  *Progin*, 2023 WL 4535129, at *4 (internal citation omitted).

The federal government does not have an obligation to create a health information

infrastructure and, if hospital systems like Defendant chose not to maintain patient

portals, like the patient portal at issue here, the government would not be required to

create its own.  See *Progin*, 2023 WL 4535129, at *4.

Additionally, although Defendant submits reports to the government and

"answered" the government's "call for federal assistance" in creating the patient portal,

Defendant has not shown that the federal government exercised the type of tight

control that would bring Defendant's conduct within the scope of the statute.  See

*Progin*, 2023 WL 4535129, at *4.  Further, the court finds there has been no formal

delegation of any of the federal government's duties to Defendant.  See *Progin*, 2023 WL

4535129, at *4, comparing *Watson*, 551 U.S. at 156 (finding that the FTC's provision of

testing specifications, inspection and supervision of the testing laboratories, and

prohibition of statements in advertising were merely regulations that did not constitute

formal delegation), with *Camacho v. Autoridad de Telefonos de P.R.*, 868 F.2d 482, 486 (1st Cir. 1989) (finding that defendants were acting under the authority of the federal government because they "were acting under express orders, control and directions of federal officers" when wiretapping).

The court finds the two earlier cases in which the courts found federal officer removal appropriate, *UPMC* and *ProMedica*, to be unpersuasive. The court in *SSM Health*, one of the many cases rejecting federal officer removal in this context, noted that the court in the first case, *UPMC*, improperly applied *Watson*'s standards because the facts in that case did "not independently prove any kind of 'special relationship' between participants in the MUP [Meaningful Use Program] and the federal government." *SSM Health*, 2023 WL 5662099, at *5, citing *Watson*, 551 U.S. at 157. The court further found that the *UPMC* court did "not supply any substantive analysis of whether the MUP implicates a basic government function or whether federal officers act as the superiors of participants in the MUP[,]" and thus the court did "not find this case persuasive." *SSM Health*, 2023 WL 5662099, at *5.

The *SSM Health* court then addressed the second case, *ProMedica*, likewise finding it unpersuasive, because, while the court found the term "acting under" to be broad and liberally construed, the court did "not explain why participation in the MUP might amount to the sort of 'special relationship' necessary for federal officer removal[,]" and the court did "not further state why participation in the MUP qualifies as acting under a federal official." *SSM Health*, 2023 WL 5662099, at *5, citing *ProMedica*, 2020 WL 7705627, at *2. The *SSM Health* court also noted that, while the *ProMedica* court acknowledged that "*Watson*'s finding that the term 'acting under' typically connotes

13

'subjection, guidance, or control' to 'one holding a superior office[,]'" it never applied that test to the case before it. *SSM Health*, 2023 WL 5662099, at *5, quoting *ProMedica*, 2020 WL 7705627, at *2. The *SSM Health* court also found that the *ProMedica* court did "not address whether participation in the MUP would support a federal officer in a basic government function." *SSM Health*, 2023 WL 5662099, at *5.

For the same reasons stated by the court in *SSM Health*, the court finds the decisions in *UPMC* and *ProMedica* to be unpersuasive, and will not follow them.

As the court in *Mohr* stated, "Defendant does not fit into the 'basic' scenario contemplated by the statute where a federal official enforces federal law, nor can Defendant be properly categorized as enjoying a 'special relationship' with the federal government like that of government contractors[.]" *Mohr*, 2023 WL 3044594, at *5. "Instead, Defendant is simply a private entity that voluntarily elects to engage in a federal incentive program for financial gain[,]" which "does not fall within even the broadest interpretation of the federal official removal statute." *Mohr*, 2023 WL 3044594, at *5. In sum, although Defendant's conduct may assist the federal government in achieving a broad goal, the court finds that its participation in the Meaningful Use Program is merely compliance with federal law and is not sufficient to bring it within the scope of the federal officer statute. See *Progin*, 2023 WL 4535129, at *5.

Like the court in *Lamarr*, this court finds that Defendant's patient portal is not something the government "needs," nor is it a "basic governmental task." See *Lamarr*, 2023 WL 6690582, at *2. Defendant is a private hospital, and retains its private character even if this aspect of its conduct has been influenced by federal statutes, rules, or regulations. See *Lamarr*, 2023 WL 6690582, at *2, citing *Martin*, 37 F.4th at 1213.

14

**A-30**

Because Defendant is not "acting under" the government by maintaining its patient portal, federal officer removal is not appropriate under 28 U.S.C. § 1442(a)(1). The court need not address the other elements of the statutory test.  See *Lamarr*, 2023 WL 6690582, at *3.  Plaintiff's Motion to Remand is therefore GRANTED.

*Attorney Fees*

Plaintiff has also asked this court to award attorney fees pursuant to 28 U.S.C. § 1447(c) for frivolous removal, arguing that Defendant's removal lacked an objectively reasonable basis.  This court has the authority to award Plaintiff attorney fees for prevailing on his Motion to Remand, but "such an award is only appropriate where 'clearly established law' demonstrates there was no basis for removal."  *Lamarr*, 2023 WL 6690582, at *3, citing *Lott v. Pfizer, Inc.*, 492 F.3d 789, 793 (7th Cir. 2007).  The court agrees with the conclusion reached by the court in *Lamarr* that Defendant's federal officer argument, while not successful, was at least colorable in light of the Seventh Circuit's military contractor cases, and so the court declines to award attorney fees.  See *Lamarr*, 2023 WL 6690582, at *3.

IT IS THEREFORE ORDERED:

(1)     Plaintiff's Motion to Remand (#9) is GRANTED.  This action is REMANDED to the Circuit Court of the First Judicial Circuit of Coles County, Illinois, for lack of subject matter jurisdiction.

**A-31**                                                            APP.0927

(2)     This case is terminated.


ENTERED this 13th day of November, 2023.


s/ COLIN S. BRUCE
U.S. DISTRICT JUDGE

APP.0928

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JENNIFER FLEECE,                        )
                                        )
                 Plaintiff,             )
                                        )
        v.                              )        No. 1:23-cv-01235-MPB-TAB
                                        )
BOARD OF TRUSTEES OF THE HANCOCK        )
REGIONAL HOSPITAL,                      )
                                        )
                 Defendant.             )

**ORDER ON MOTION TO REMAND**

Before the Court is the Motion of Plaintiff Jennifer Fleece (for a putative class) to

Remand (Docket No. 16) and Defendant Board of Trustees of the Hancock Regional Hospital's

("Hancock Regional") Motions to Dismiss. (Docket No. 18; Docket No. 29). Defendant removed

this case from state court under 28 U.S.C. § 1442(a)(1). (Docket No. 1). Plaintiff brings Indiana

state law claims for breach of implied contract, unjust enrichment, violation of the Indiana

Deceptive Consumer Sales Act, and violation of the Indiana Wiretapping Act, alleging that

Defendant shared health information without consent by imbedding the "Meta Pixel" onto its

website. For the reasons detailed below, Plaintiff's Motion to Remand is **GRANTED.**

Under 28 U.S.C. § 1442(a)(1), federal officers or any person acting under that officer

may remove a state lawsuit to federal court if they are: "(1) a person within the meaning of the

statute, (2) acting under the United States, its agencies, or its officers, (3) acting under color of

federal authority, and (4) have a colorable federal defense." *Betzner v. Boeing Co.*, 910 F.3d

1010, 1015 (7th Cir. 2018). The parties do not dispute the first element, so the Court begins its

analysis with element two of the federal officer removal test.

A.       **Acting Under Federal Officers**

Hancock Regional argues that it assisted the federal government by complying with the

Department of Health and Human Services' "Meaningful Use Program" that, in part, encourages

hospitals to make health care records available to patients online in exchange for incentive

payments. (Docket No. 21, Def.'s Br. at ECF pp. 8, 10). Where a private party seeks to remove

under 1442(a)(1) because it acted "under" a federal officer, the Supreme Court has held that

"under" must refer to relationships with one holding a superior position and "typically involves

subjection, guidance, or control," and that the "private person's 'acting under' must involve an

effort to assist, or to help carry out, the federal superior's duties or tasks." *Watson v. Philip*

*Morris Companies, Inc.*, 551 U.S. 142, 143 (2007).

The *Watson* Court also explained that:

> a highly regulated firm cannot find a statutory basis for removal in the fact of
> federal regulation alone. A private firm's compliance (or non-compliance) with
> federal laws, rules, and regulations does not by itself fall within the scope of the
> statutory phrase "acting under" a federal "official." And that is so even if the
> regulation is highly detailed and even if the private firm's activities are highly
> supervised and monitored.

*Id.* at 153.

The Seventh Circuit has held in several cases that private corporations may "act under"

the federal government. 28 U.S.C. § 1442(a)(1). In *Ruppel v. CBS Corp.*, the court held that a

turbine manufacturer for the United States Navy "acted under" a federal officer because it

worked "hand-in-hand with the government" to "achieve an end [the government] would have

otherwise used its own agents to complete." 701 F.3d 1176, 1181 (7th Cir. 2012). In *Betzner v.*

*Boeing Co.*, the court held that an aircraft manufacturer for the United States Air Force was

"acting under" the federal government because it "acted under the military's detailed and ongoing

control" and performed a role the federal government would have "otherwise used its own agents

**A-34**                                                  APP.**1280**

to complete." 910 F.3d 1010, 1015 (7th Cir. 2018). Finally, in *Baker v. Atlantic Richfield Co.*, the court held that an owner of a plant conducting wartime operations "acted under" federal authority by producing chemicals that the government would have otherwise "had to manufacture" and because the government used the chemicals "'to help conduct a war.'" 962 F.3d 937, 942 (7th Cir. 2020) (quoting *Watson*, 551 U.S. at 153)).

However, the Seventh Circuit has never held that all private contractors "performing tasks for the government" are covered under Section 1442 because "being subject to federal regulations or performing some functions that the government agency controls is not enough to transform a private entity into a federal officer." *Panther Brands, LLC v. Indy Racing League*, LLC, 827 F.3d 586, 590 (7th Cir. 2016). In *Martin v. Peterson Health Operations, LLC*, the court held that a nursing home "subject to extensive federal regulation (especially if it hope[d] to be reimbursed under the Medicare or Medicaid program)" retained its "private character" and was not covered by Section 1442. 37 F.4th 1210, 1213 (7th Cir. 2022).

Hancock Regional cites two out-of-circuit, non-binding district court cases from 2020 with parallel facts for support. *Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health System, Inc.*, No. 3:20-CV-1581, 2020 WL 7705627, at *2 (N.D. Ohio Oct. 30, 2020). According to these two decisions, participation in the "Meaningful Use Program" is sufficient to satisfy the "acting under" requirement for federal officer removal. *ProMedica Health System, Inc.*, 2020 WL 7705627, at *2.

Hancock Regional, however, does not address the eleven district court opinions with parallel facts written since 2020 rejecting the reasoning in *Doe I v. UPMC* and *Doe v. ProMedica Health System, Inc.* and finding removal improper. Several of these courts have explicitly criticized the reasoning in the two out-of-circuit cases Hancock Regional cites, with one court

**A-35**                                                    APP.1281

stating that the two opinions entail "an overly broad interpretation of what it means to assist a federal superior with its tasks or duties, which 'would permit removal to federal court in circumstances far beyond anything Congress intended.'" *Quinto v. Regents of the Univ. of CA*, No. 3:22-CV-04429, 2023 WL 1448050, at *3 (N.D. Cal. Feb. 1, 2023) (quoting *Jalili-Farshchi v. Aldersly*, No. 3:21-CV-04727, 2021 WL 6133168, at *4 (N.D. Cal. Dec. 29, 2021)).

Last month, this Court addressed two motions to remand on the exact issue presented in this case. *Elkins v. Southeastern Indiana Health Mngt Inc.*, No. 1:23-CV-01117, 2023 WL 6567438 (S.D. Ind. Oct. 10, 2023); *Lamarr v. Goshen Health System, Inc.*, No. 1:23-CV-01173, 2023 WL 6690582 (S.D. Ind. Oct 12, 2023). In both cases, plaintiffs and a putative class alleged that a website tracking pixel within the hospital's patient portal shared their health data without consent and hospital defendants removed state court cases to federal court under 28 U.S.C. § 1442(a)(1). *Elkins*, 2023 WL 6567438, at *1; *Lamarr*, 2023 WL 6690582, at *1. In both cases, the Court held that the hospitals' creation and hosting of patient portals was "not something the government 'needs,' nor is the maintenance of electronic health records a 'basic governmental task.'" *Elkins*, 2023 WL 6567438 at *2 (quoting *Baker*, 962 F.3d at 942). Further, this Court established that a private hospital making a website to earn federal government incentive payments is "absolutely not" a government agent. *Elkins*, 2023 WL 6567438 at *1; *Lamarr*, 2023 WL 6690582 at *1.

This Court agrees with the reasoning in *Lamarr* and *Elkins* and sees no reason to reach a different conclusion in this case. Hancock Regional is more like the regulated nursing home seeking reimbursement in *Martin* than the three military manufacturers in *Ruppel, Betzner*, and *Baker*. Hancock Regional argues that without its role in creating a patient portal, the federal government would be "left alone to complete its federal mission of digitizing health

**A-36**                                                                    APP.1282

information." (Docket No. 21 at ECF p. 11). However, unlike the military manufacturer cases, there is no evidence here that without Hancock Regional's work, the federal government would have used its own agents to create online portals for healthcare patients to access their records. *Ruppel*, 701 F.3d at 1181.

Because Hancock Regional is not "acting under" the federal government by managing patient portals, federal officer removal is not appropriate. The Court need not address the other elements of the officer removal test.

### B.   Attorney Fees

The Court has discretion to award Fleece attorney fees under 28 U.S.C. § 1447(c). When "clearly established law demonstrate[s] that [a defendant] had no basis for removal, then a district court should award a plaintiff [her] attorneys' fees." *Lott v. Pfizer, Inc.*, 492 F.3d 789, 793 (7th Cir. 2007). While Hancock Regional's argument was thin, it was not made in the face of clearly established law demonstrating no basis for removal. This Court declines to award attorney fees.

### I.   CONCLUSION

Fleece's Motion to Remand, (Docket No. 16), is **GRANTED** with the exception that the court declines to award attorney fees.  The case is **REMANDED** to Marion Superior Court, Commercial Court. Hancock Regional's Motions to Dismiss, (Docket No. 18; Docket No. 29) are **DENIED** without prejudice.

IT IS SO ORDERED.

Dated:  November 17, 2023

Matthew P. Brookman, Judge
United States District Court
Southern District of Indiana

5

Served electronically on all ECF-registered counsel of record.

**A-38**                                    **APP.1284**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KEITH CHIARO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-01051-SEB-CSW |
| | ) | |
| THE METHODIST HOSPITALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING PLAINTIFFS' MOTION TO REMAND**

Plaintiffs Keith Chiaro and Jane Doe have brought this putative class action against Defendant The Methodist Hospitals, Inc. ("Methodist"), alleging that a website-tracking "pixel" embedded in the patient portal that Methodist uses at its healthcare locations throughout northwest Indiana disseminated their health data to others without their consent. Plaintiffs' complaint alleges various state law claims against Methodist, including invasion of privacy, breach of implied contract, unjust enrichment, breach of fiduciary duty, and violation of the Indiana Deceptive Consumer Sales Act.[1] Methodist removed the litigation from the Indiana Commercial Court in Marion County, Indiana, under 28 U.S.C. § 1442(a)(1), the federal officer removal statute. Now before the Court

---

[1] We note that, although Plaintiffs have twice amended their complaint while their motion to remand was pending, the Court in evaluating remand considers the complaint that was operative at the time of removal, which here, is Plaintiffs' original complaint. *United Farm Bureau Mut. Ins. Co. v. Metro. Hum. Rels. Comm'n*, 24 F.3d 1008, 1014 (7th Cir. 1994) (citing *Pullman Co. v. Jenkins*, 305 U.S. 534, 537–38 (1939)).

1

is Plaintiffs' Motion to Remand [Dkt. 12].  For the reasons detailed below, we <u>GRANT</u> that motion.

<u>**Discussion**</u>

**I.      Remand**

Methodist removed this case under 28 U.S.C. § 1442(a)(1), "which permits the removal of cases in which a federal agency or officer, or 'any person acting under that officer,' is a defendant." *Martin v. Peterson Health Operations, LLC*, 37 4th 1210, 1212 (7th Cir. 2022).  "Federal officer removal is appropriate when 'the defendant (1) is a person within the meaning of the statute, (2) is acting under the United States, its agencies, or its officers, (3) is acting under color of federal authority, and (4) has a colorable federal defense." *Baker v. Atlantic Richfield, Co.*, 962 F.3d 937, 941 (7th Cir. 2020) (quoting *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018)).  All four of these requirements must be met to remove a case to federal court, *Doe v. Sarah Bush Lincoln Health Center*, No. 23-CV-2170, 2023 WL 7690179, at *3 (C.D. Ill. Nov. 13, 2023), and the party seeking removal bears the burden of establishing federal jurisdiction. *Tri-State Water Treatment, Inc. v. Bauer*, 845 F.3d 350, 352 (7th Cir. 2017).

Plaintiffs argue that this action must be remanded because Methodist has failed to satisfy the second requirement for federal officer removal, to wit, that Methodist "is acting under the United States, its agencies, or its officers," merely by complying with the Department of Health and Human Services' (HHS) "Meaningful Use Program" that, in part, encourages hospitals to make health care records available to patients online in exchange for incentive payments.  Methodist rejoins that it has established that it was

2

**A-40**

APP.1655

"acting under" the federal government by receiving payment for complying with the

Meaningful Use regulations because, in doing so, it was "assisting the federal

government with its initiative to provide patients … with online access to their health

care records," and without Methodist's (and comparable medical providers') role in

creating a patient portal, the federal government would be "left alone to complete its

federal mission of digitizing health information."  Dkt. 21 at 11, 13.

      The United States Supreme Court has ruled that, for a private entity like Methodist

to be "acting under" a federal officer, the private entity must be involved in "an effort to

assist, or to help carry out, the duties or tasks of the federal superior."  *Watson v. Phillip*

*Morris Cos., Inc.*, 551 U.S. 142, 152 (2007) (emphasis removed).  Typically, "[t]hat

relationship … involves subjection, guidance, or control."  *Id.* at 151 (quotation marks

omitted).  Mere compliance or non-compliance with federal laws, rules, and regulations

"does not by itself fall within the scope of the statutory phrase 'acting under' a federal

'official' … even if the regulation is highly detailed and even if the private firm's

activities are highly supervised and monitored."  *Id.* at 153.  However, where a private

contractor helps "the Government to produce an item that it needs[,] [t]he assistance that

private contractors provide federal officers goes beyond simple compliance with the law

and helps officers fulfill other basic governmental tasks."  *Id.*

      Applying *Watson*, the Seventh Circuit has found on several occasions that private

corporations "act[ed] under" the federal government for purposes of federal officer

removal when they were acting under the control and supervision of the government as

military contractors producing goods and/or performing tasks the government would

otherwise have to produce or perform itself.  *E.g.*, *Baker v. Atlantic Richfield Co.*, 962 F.3d 937, 942 (7th Cir. 2020) (holding that the owner of a plant conducting wartime operations "acted under" federal authority when it produced chemicals "to help conduct a war" that the government would have otherwise "had to manufacture"); *Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018) (holding that an aircraft manufacturer for the United States Air Force was "acting under" the federal government because it "acted under the military's detailed and ongoing control" and performed a role the federal government would have "otherwise used its own agents to complete"); *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (holding that a turbine manufacturer for the United States Navy that worked "hand-in-hand with the government" to "achieve an end [the government] would have otherwise used its own agents to complete" was "acting under" a federal officer).

In contrast, the Seventh Circuit has held, in line with *Watson*, that "merely being subject to federal regulations or performing some functions that the government agency controls is not enough to transform a private entity into a federal officer."  *Panther Brands, LLC v. Indy Racing League, LLC*, 827 F.3d 586, 590 (7th Cir. 2016).  Thus, for example, in *Martin v. Peterson Health Operations, LLC*, the Seventh Circuit recently held that, despite being "subject to extensive federal regulation (especially if it hope[d] to be reimbursed under the Medicare or Medicaid program)," a nursing home nonetheless retained its "private character" and was not "acting under" the federal government for purposes of § 1442(a)(1) because "regulation does not turn a private entity into a public actor."  37 F.4th 1210, 1212–1213 (7th Cir. 2022).

Although the Seventh Circuit has not yet had occasion to address the applicability of § 1442(a)(1) under the precise facts presented here, several district courts across the country, including ours, have done so.  Within the past month, this court has addressed three motions to remand in which the plaintiffs and putative classes alleged that a website tracking pixel within the hospitals patient portal shared their health data without consent and the hospital defendants removed state court cases to federal court under § 1442(a)(1). *See Fleece v. Board of Trustees of the Hancock Regional Hosp.*, No. 1:23-cv-01235-MFB-TAB (S.D. Ind. Nov. 17, 2023); *Lamarr v. Goshen Health Sys. Inc.*, No. 1:23-cv-01173, 2023 WL 6690582 (S.D. Ind. Oct. 12, 2023), *appeal docketed*, No. 23-3175 (7th Cir. Nov. 12, 2023); *Elkins v. Southeastern Ind. Health Mgmt. Inc.*, No. 1:23-cv-01117, 2023 WL 6567438 (S.D. Ind. Oct. 12, 2023), *appeal docketed*, No. 23-3159 (7th Cir. Nov. 9, 2023).  All three of these cases were remanded to state court on grounds that the hospitals' creation and hosting of patient portals was "not something the government 'needs,' nor is the maintenance of electronic health records a 'basic governmental task,'" (*Elkins*, 2023 WL 6567438, at *2 (quoting *Baker*, 962 F.3d at 942); *accord Lamarr*, 2023 WL 6690582, at *2), nor was there any "evidence … that without [the defendant hospital's] work, the federal government would have used its own agents to create online portals for healthcare patients to access their records." *Fleece*, Dkt. 35 at 5.  Accordingly, the defendant hospitals in each of these cases were found to be "more like the regulated nursing home seeking reimbursement in *Martin* than the three military manufacturers in *Ruppel*, *Betzner*, and *Baker*" and therefore were not "acting under" the federal government as required by § 1442(a)(1).  *Lamarr*, 2023 WL 6690582, at *2.

5

A-43                                                    APP.1658

We find persuasive the reasoning set forth in *Elkins*, *Lamar*, and *Fleece*, and hold that it applies equally to the facts at bar.  The mere fact that, in complying with the Meaningful Use Program for incentive payments, Methodist is furthering a broad goal of the federal government to increase patients' access to online healthcare information, without more, is not enough to satisfy the "acting under" requirement for federal officer removal.  This conclusion is in line with the majority of our sister district courts that have addressed the same issue and have decided to remand in similar circumstances.  *See Sarah Bush Lincoln Health Ctr.*, 2023 WL 7690179, at *4 (collecting cases).

In opposition to remand, Methodist relies on two out-of-circuit district court decisions—*Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020) and *Doe v. ProMedica Health System, Inc.*, No. 3:20 CV 1581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020)—that found jurisdiction under § 1442(a)(1) in circumstances analogous to those presented here.  However, in its reliance, Methodist ignores the fact that, since these decisions were issued in 2020, "'the tide has turned decidedly in the other direction,' and most cases have now concluded that there is no basis for federal officer removal under these facts." *Sarah Bush Lincoln Health Ctr.*, 2023 WL 7690179, at *4. A sea change in and of itself is, of course, not necessarily dispositive, but we agree with the conclusion by those district courts that the cases cited by Methodist "entailed an overly broad interpretation of what it means to assist a federal superior with its tasks or duties, which would permit removal to federal court in circumstances far beyond anything Congress intended." *Crouch v. St. Agnes Med. Ctr.*, No. 1:22-cv-01527, 2023 WL 3007408, at *5 (E.D. Cal. Apr. 19, 2023) (citations and quotation marks omitted).

## II.   Attorney Fees

The Court has discretion to award Plaintiffs attorney fees under 28 U.S.C.

§ 1447(c) for prevailing on her motion to remand.  The Seventh Circuit has found such an

award appropriate where "clearly established law demonstrate[s] that [a defendant] had

no basis for removal …."  *Lott v. Pfizer, Inc.*, 492 F.3d 789, 793 (7th Cir. 2007).  Here,

although Methodist did not prevail on its federal officer argument, we cannot say that it

was made in the face of "clearly established law" demonstrating no basis for removal.

Accordingly, we decline to award attorney fees.

<u>Conclusion</u>

For these reasons, Plaintiffs' Motion to Remand [Dkt. 12] is <u>GRANTED</u>, with the

exception that the Court declines to award attorney fees.  This cause is hereby

<u>REMANDED</u> to Marion Superior Court, Commercial Court.  All currently pending

motions are <u>DENIED</u> without prejudice.

IT IS SO ORDERED.

Date: _____11/29/2023_____       _Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

**A-45**                                               APP.1660

Distribution:

Mary Kate Dugan
Cohen & Malad, LLP
mdugan@cohenandmalad.com

Michelle R. Gomez
Baker & Hostetler LLP
mgomez@bakerlaw.com

Paul G Karlsgodt
Baker & Hostetler LLP
pkarlsgodt@bakerlaw.com

Emily Davin Kopp
Cohen & Malad, LLP
ekopp@cohenandmalad.com

Vess Allen Miller
COHEN & MALAD LLP
vmiller@cohenandmalad.com

Tyler John Moorhead
BOSE MCKINNEY & EVANS LLP
tmoorhead@boselaw.com

Amina Thomas
COHEN & MALAD LLP
athomas@cohenandmalad.com

Lynn A. Toops
COHEN & MALAD LLP
ltoops@cohenandmalad.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
pzimmerly@boselaw.com

**A-46**

APP.1661